**NORLIN CORPORATION,**
Plaintiff-Appellant,

v.

**ROONEY, PACE INC.,** Patrick J. Rooney, Piezo Electric Products, Inc. and John Does 2–10, Defendants-Appellees,

**PIEZO ELECTRIC PRODUCTS, INC.,**
Defendant and
Counterclaimant-Appellee,

v.

**NORLIN CORPORATION,** Counterclaim Defendant-Appellant,

and

Andean Enterprises, Inc., Norlin Industries, Inc., Norton Stevens, Gilbert A. Simpkins, Zachary Marantis, James McGuiness, Harold Krensky, Katharine T. O'Neil, Edward R. McPherson, Jr. and James K. Baker, Additional Counterclaim Defendants-Appellants.

No. 1427, Docket 84–7360.

United States Court of Appeals, Second Circuit.

Argued June 1, 1984.
Decided June 27, 1984.

John Logan O'Donnell, Olwine, Connelly, Chase, O'Donnell & Weyher, New York City, for counterclaim defendants-appellants Norlin Corp., Andean Enterprises, Inc., and Norlin Industries, Inc.

Gregory P. Joseph, Fried, Frank, Harris, Shriver & Jacobson, William G. McGuinness (on the brief), New York City, for counterclaim defendants-appellants Norton Stevens, Gilbert A. Simpkins, Zachary

Marantis, James McGuiness, Harold Krensky, Katharine T. O'Neil, Edward R. McPherson, Jr., and James K. Baker.

Jonathan J. Lerner, Skadden, Arps, Slate, Meagher & Flom, New York City, for counterclaimant-appellee Piezo Elec. Products, Inc.

Before FEINBERG, Chief Judge, KAUFMAN and PIERCE, Circuit Judges.

IRVING R. KAUFMAN, Circuit Judge.

Contests for corporate control have become ever more frequent phenomena on the American business scene. Waged with the intensity of military campaigns and the weaponry of seemingly bottomless bankrolls, these battles determine the destinies of large and small corporations alike. Elaborate strategies and ingenious tactics have been developed both to facilitate takeover attempts and to defend against them. Skirmishes are fought in company boardrooms, in shareholders' meetings, and, with increasing regularity, in the courts.

The efforts of targeted management to resist acquisitive moves, and the means they employ, have been alternatively praised and damned. Proponents of corporate "free trade" argue that defensive techniques permit managers to entrench themselves and thus avoid accountability for their performance, at the expense of shareholders who are denied the opportunity to maximize their investment in sought-after corporations.[1] Opponents contend that takeover struggles squander enormous capital resources which could better be spent to improve industrial productivity and to develop and commercialize new technologies.[2]

When these battles for corporate dominance spawn legal controversies, the judicial role is neither to displace the judgment of the participants nor to predetermine the outcome. Rather, the responsibility of the court is to insure that rules designed to safeguard the fairness of the takeover process be enforced. Our most important duty is to protect the fundamental structure of corporate governance. While the day-to-day affairs of a company are to be managed by its officers under the supervision of directors, decisions affecting a corporation's ultimate destiny are for the shareholders to make in accordance with democratic procedures.

The instant case involves defensive action taken by a company that feared it might soon be the target of a takeover attempt. The first salvo in this battle was fired by appellee Piezo Electric Products, Inc., which in conjunction with Rooney, Pace Inc., began buying up large blocks of stock of appellant Norlin Corporation. In response, the board of directors of Norlin issued new common and voting preferred stock to a wholly-owned subsidiary and a newly-created employee stock option plan. Since Norlin would control the voting of the newly-issued stock, the effect of the transactions was to concentrate greater voting control in the hands of its board of directors, and thus to ward off any acquisitive moves that might be made against the company. Piezo sought and the district court granted a preliminary injunction barring the board from voting the stock in question. The judge found that any vote resulting from these transfers would likely be illegal, and that a possible consequence of the stock transfer—delisting from the New York Stock Exchange—would cause irreparable injury to Norlin's shareholders. We hold that the district court's findings were not erroneous, and therefore affirm. Before analyzing the legal issues presented, we shall describe the events that gave rise to the present dispute.

I

Appellant Norlin Corporation ("Norlin") is a diversified company whose principal

---

1. *See, e.g.,* Easterbrook and Fischel, "The Proper Role of a Target's Management in Responding to a Tender Offer," 94 *Harv.L.Rev.* 1161 (1981); Gelfond and Sebastian, "Reevaluating the Duties of Target Management in a Hostile Tender Offer," 60 *B.U.L.Rev.* 403 (1980).

2. *See, e.g.,* Lipton, "Takeover Bids in the Target's Boardroom," 35 *Bus.Law.* 101 (1979); Steinbrink, "Management's Response to the Takeover Attempt," 28 *Case W.L.Rev.* 882 (1978).

lines of business are the manufacture of musical instruments and financial printing. Norlin is incorporated in the Republic of Panama, but has no significant operations in that country. The company's principal place of business and executive offices are located in White Plains, New York, and its shareholder and directors' meetings take place in New York as well.

Appellee Piezo Electric Products, Inc. ("Piezo") is primarily engaged in the research, development, manufacture and sale of piezoelectric and thermistor products. It is a Delaware corporation with its principal place of business in Cambridge, Massachusetts. On the two trading days of January 6 and 12, 1984, and in conjunction with the investment banking firm Rooney, Pace Inc., Piezo purchased some 32% of Norlin's common stock in a number of separate transactions. Fearful that a takeover attempt was imminent, Norlin filed suit on January 13, alleging various violations of the federal securities laws. The company sought to enjoin appellees from acquiring any additional Norlin stock, to force divestiture of stock already purchased, and to bar voting of Norlin stock owned by them. After hearing oral argument, Judge Edelstein denied Norlin's motions for a temporary restraining order and expedited discovery, finding that the company had not demonstrated irreparable harm stemming from the stock purchases.

Having failed to secure protection in the courts, Norlin immediately took defensive measures on its own. On January 20, 1984, the same day the judge ruled on its motions, Norlin's board transferred 28,395 shares of common stock to Andean Enterprises, Inc. ("Andean"), a wholly-owned subsidiary of Norlin also incorporated in Panama. The transfer was purportedly made in consideration for Andean's cancellation of a Norlin promissory note in the amount of $965,454. Three days later, on January 23, Norlin announced it had "retained the investment banking firm of Dillon, Read & Co., Inc. to explore various opportunities which may be available to Norlin, including the merger or sale of Norlin, the repurchase of shares of Norlin Common Stock or the sale or issuance of shares or other securities of Norlin."

On January 25, Norlin's board approved two additional transfers of large blocks of stock. The board conveyed 800,000 shares of authorized but unissued preferred stock, which would vote on a share for share basis with Norlin common, to Andean in exchange for a $20 million interest-bearing note. On the same day, the board created the Norlin Industries, Inc. Employee Stock Option Plan and Trust ("ESOP"), and appointed three Norlin board members as trustees. The board immediately transferred 185,000 common shares to the ESOP in consideration for a promissory note in the principal amount of $6,824,945. In filings with the Securities and Exchange Commission, Norlin acknowledged that it would be the beneficial owner of all of the transferred shares. Moreover, it is undisputed that the board retained voting control of the shares conveyed to Andean and to the ESOP. Together with shares already under the board's control, the January 20 and 25 transactions resulted in the Norlin directors controlling the votes of 49% of the corporation's outstanding stock.

Also on January 25, Norlin's Chairman and Chief Executive Officer, Norton Stevens, and President, Gilbert A. Simpkins, wrote to the company's shareholders explaining these actions. Their letter mentioned the Piezo and Rooney, Pace acquisitions, and asserted that "[t]he Board of Directors and management are strongly opposed to the stated purposes of Rooney, Pace and Piezo and are taking all steps deemed necessary or appropriate to protect Norlin's shareholders and the value of their investment in the Company." The letter offered no justification for the stock transfers to Andean and the ESOP other than to ward off a prospective attempt to obtain control of Norlin.

Norlin's directors concede that prior to taking the steps described above, they were warned by their financial advisers that absent shareholder approval, the stock transactions violated the rules of the New

York State Exchange ("NYSE") and might result in the delisting of Norlin common stock. On March 15, the NYSE did in fact suspend trading in Norlin common, and indicated its intention to delist the stock. A release announcing the move explained:

The Exchange said it deems [the stock issuances to Andean and to the ESOP] to have resulted in a change in control of the company.

The Exchange said its policy requires that a company obtain shareholder approval in such circumstances and it said its decision to delist the Norlin securities results from the fact that Norlin didn't seek shareholder approval of the issuance.

In addition Norlin is presently below the Big Board's continued listing criteria relating to the number of publicly held shares—at least 600,000 shares—and the number of holders of 100 shares or more—at least 1,200—the Exchange said.

On February 9, some time before the NYSE announcement was issued, Piezo filed the counterclaim that is the basis of the instant action. Its complaint alleged that the Norlin stock transfers violated Panama and New York law in addition to several provisions of the federal securities laws. Piezo contended that the transactions had no valid business purposes, and were intended solely "to further entrench management by placing additional shares of voting stock at management's disposal." To forestall delisting from the NYSE, as well as other alleged harms to Piezo in its capacity as a Norlin shareholder, the counterclaimant sought to have the issuance of shares to Andean and the ESOP declared void, and to bar Norlin from voting those shares for any purpose.

Piezo subsequently moved for preliminary relief, and Judge Edelstein heard argument on the motion. In a written order entered April 16, the judge granted Piezo's application for a preliminary injunction. He stated that Panamanian law barred Norlin from voting the shares transferred to its wholly-owned subsidiary, and that the issuance of the ESOP shares was "clearly part of the same management scheme to entrench itself in power...." His order also concluded that Piezo had met its burden of demonstrating irreparable harm, "because the delisting of the common stock together with the inability of purchasers generally to acquire over-the-counter shares on margin seriously limits the liquidity of such shares; and further, the delisting of securities generally is a serious loss of prestige and has a chilling effect on prospective buyers...." Based upon these determinations, the judge barred Norlin from voting the contested shares pending further proceedings, and ordered Norlin to take "all reasonable steps necessary and desirable" to prevent delisting from the NYSE.

On appeal, Norlin takes issue with every one of Judge Edelstein's findings and conclusions, arguing that its actions were well within the board's discretion once it determined that Piezo's designs were not in the company's best interest. Before we turn to the merits of Norlin's arguments, we must dispose of several preliminary issues which provide the context for our discussion.

## II

■ We begin by delineating the scope of our review. In this Circuit, a preliminary injunction will not issue without a showing of irreparable harm. *See Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir.1979). In addition, the moving party must demonstrate either a likelihood of success on the merits, or sufficiently serious questions going to the merits and a balance of hardships tipping decidedly in favor of equitable relief. *See Arthur Guinness & Sons, PLC v. Sterling Publishing Co., Inc.*, 732 F.2d 1095, 1099 (2d Cir.1984). The injunction granted by the district court was predicated upon the first of these alternative grounds.

■ As a general rule, a preliminary injunction will be sustained on appeal absent an abuse of discretion by the lower court. *Jack Kahn Music Co., Inc. v. Baldwin Piano & Organ Co.*, 604 F.2d 755, 758 (2d

Cir.1979). The propriety of this principle stems from our recognition that a trial court is in a better position to assess the credibility of testimony and make factual findings than an appellate court. The rule is, however, bounded by its own rationale. Where there has been no evidentiary hearing, and the decision below is based entirely upon legal arguments and papers submitted to the court, we may undertake our own review of the pleadings, affidavits and depositions to ascertain the correctness of the district judge's ruling. *See Dopp v. Franklin National Bank*, 461 F.2d 873, 879 (2d Cir.1972). In particular, when the granting of an injunction rests upon an error of law, that in itself constitutes a ground for reversal. *See Buffalo Courier-Express, Inc., v. Buffalo Evening News, Inc.*, 601 F.2d 48, 59 (2d Cir.1979).

Norlin initially raises a procedural barrier which, it contends, prevents Piezo from asserting any claim for relief arising from the stock transfers. Norlin argues that New York courts subscribe to the "internal affairs rule," under which the law of the jurisdiction of incorporation governs internal corporate matters, including the existence and extent of corporate fiduciary obligations. Because Norlin is a Panamanian corporation, it contends, a New York court under this doctrine would apply Panama law to determine whether Norlin's shareholders have a cause of action against its directors for breach of their fiduciary duty. According to the affidavits of Panamanian lawyers submitted on Norlin's behalf, however, Panama law conditions the existence of a cause of action by shareholders against directors upon the passage of a resolution authorizing the lawsuit at a general meeting of shareholders. Neither party suggests that such a resolution has been proposed or adopted. Hence, Norlin asserts, Piezo has failed to state a claim for relief.

■■■ We need not discuss the fidelity of New York courts to the internal affairs rule at this juncture, although we shall return to that issue *infra*. We find it unnecessary to adopt the choice of law ruling Norlin urges, because the New York legislature has expressly decided to apply certain provisions of the state's business law to any corporation doing business in the state, regardless of its domicile. Thus, under New York Business Corporation Law ("NYBCL") § 1319,[3] a foreign corporation operating within New York is subject, *inter alia*, to the provisions of the state's own substantive law that control shareholder actions to vindicate the rights of the corporation. NYBCL § 626,[4] made applicable to foreign corporations by § 1319, permits a shareholder to bring an action to redress harm to the corporation, including injury wrought by the directors themselves. *See Barr v. Wackman*, 36 N.Y.2d 371, 368 N.Y.S.2d 497, 329 N.E.2d 180 (1975).

■■■ Section 626(c) requires a prospective plaintiff-shareholder to make a demand on the board to initiate action directly, before bringing suit on the corporation's behalf. Piezo does not claim to have taken that step. It has long been established, however, that such a demand may be ex-

---

**3.** NYBCL § 1319 provides in pertinent part:
(a) ... the following provisions, to the extent provided therein, shall apply to a foreign corporation doing business in this state, its directors, officers and shareholders:
....
(2) Section 626 (Shareholders' derivative action brought in the right of the corporation to procure a judgment in its favor).
....

**4.** NYBCL § 626 provides in part:
(a) An action may be brought in the right of a domestic or foreign corporation to procure a judgment in its favor, by a holder of shares or of voting trust certificates of the corporation or of a beneficial interest in such shares or certificates.
(b) In any such action, it shall be made to appear that the plaintiff is such a holder at the time of bringing the action and that he was such a holder at the time of the transaction of which he complains, or that his interest therein devolved upon him by operation of law.
(c) In any such action, the complaint shall set forth with particularity the efforts of the plaintiff to secure the initiation of such action by the board or the reasons for not making such effort.

cused if it would be an idle gesture, as in a situation similar to that before us, where it would be directed to the very persons against whom relief is sought. *Continental Securities Co. v. Belmont*, 206 N.Y. 7, 99 N.E. 138 (1912). A demand would be particularly futile when "[a]cting officially, the board, qua board, is claimed to have participated or acquiesced in assertedly wrongful transactions," *Barr v. Wackman, supra*, 36 N.Y.2d at 379, 368 N.Y. S.2d at 506, 329 N.E.2d at 187. That is precisely the case here. Contrary to appellants' argument, therefore, appellee could proceed under New York law and assert the claims at issue. Accordingly, we turn to Piezo's likelihood of success on the merits of its claims.

### III

Piezo asserts, and the district court appropriately found, that the illegality of voting the stock transferred to Andean and the ESOP had been demonstrated with sufficient certainty to warrant injunctive relief. As we will explain, the right of a wholly-owned subsidiary to vote shares of a parent company's stock is controlled by statute. The propriety of an issuance of stock to an ESOP in the context of a contest for corporate control has not been legislatively resolved, and so must be assessed in relation to fiduciary principles governing the conduct of officers and directors. Thus, we must analyze the two issues separately.

### A. *Voting of Andean's shares.*

■ Both New York and Panamanian law expressly prohibit a subsidiary that is controlled by its parent corporation from voting shares of the parent's stock. NYBCL § 612(b) provides:

Treasury shares and shares held by another domestic or foreign corporation of any type or kind, if a majority of the shares entitled to vote in the election of directors of such other corporation is held by the corporation, shall not be shares entitled to vote or to be counted in

determining the total number of outstanding shares.

Article 35 of Panamanian Cabinet Decree 247 of July 16, 1970, part of the corporation law of Panama, states the same rule in somewhat different terms:

Shares of a corporation owned by [an]other corporation in which the former corporation owns the majority of shares shall not be entitled to vote at Meetings of Shareholders nor shall be deemed as issued and outstanding shares for purposes of quorum.

Both statutes seek to safeguard minority shareholders from management attempts at self-perpetuation. If cross-ownership and cross-voting of stock between parents and subsidiaries were unregulated, officers and directors could easily entrench themselves by exchanging a sufficient number of shares to block any challenge to their autonomy. *See* Hornstein, *Corporate Law and Practice* § 311, at 410 (1959).

■ Norlin, however, contends that neither New York nor Panama law should be applied to bar Andean from voting the Norlin shares it owns. New York, Norlin argues, applies the internal affairs rule (discussed *supra*) to issues of corporate governance. Thus, a New York court would look to the law of Panama, as the state of incorporation, to decide whether Andean can vote its shares. But under Article 37 of the above-mentioned Panamanian Cabinet Decree, the prohibition contained in Article 35 is applicable only "to corporations registered at the National Securities Commission [of Panama] and to such corporations whose shares are sold in the market, although such corporations do not offer their own shares to the public." In other words, unless a corporation undertakes to list its shares for sale in Panama, or its shares are in fact sold in that country, the proscription contained in Article 35 does not govern.

The district judge appears to have accepted the argument that Panama law is controlling. He found, based upon an affidavit offered by Piezo, that a purchase of Norlin stock had been made through a

branch office of Merrill, Lynch, Pierce, Fenner & Smith located in Panama City. Thus, while Norlin shares concededly are not registered at the Securities Commission, the judge determined that they were "sold in the market," and so governed by Article 35. On appeal, however, appellants have brought to our attention a recent opinion by the General Attorney of Panama, dated May 2, 1984, which interprets the requirement that shares be "sold in the market," the alternative predicate to the application of Article 35. The opinion states that a company's shares are not deemed to be "sold in the market" if it "sell[s] shares in a private manner to a number of persons of no mre [sic] than 10 per year." Because Piezo has only documented a single sale of Norlin stock, Norlin urges, Piezo has not demonstrated that Panama law should govern the voting of shares owned by Andean.

 We accept the initial premise of Norlin's argument—that a federal court adjudicating a state law claim must apply the choice of law principles of the forum state. *Klaxon Co. v. Stentor Electric Manufacturing Co., Inc.,* 313 U.S. 487, 496, 61 S.Ct. 1020, 1021, 85 L.Ed. 1477 (1941). We are not so certain, however, that a New York court would apply the internal affairs rule and decide this case by reference to Panama law. In *Greenspun v. Lindley,* 36 N.Y.2d 473, 369 N.Y.S.2d 123, 330 N.E.2d 79 (1975), the Court of Appeals confronted the question whether New York or Massachusetts law should govern a shareholder's derivative action brought in a New York court against the trustees of a business trust organized under laws of Massachusetts. Although holding that Massachusetts law controlled, the court rejected "any automatic application of the so-called 'internal affairs' choice-of-law rule...." 36 N.Y.2d at 478, 369 N.Y.S.2d at 126, 330 N.E.2d at 81. In accepting the application of Massachusetts law as expressly provided in the declaration of trust, the court noted:

> [T]his record is barren of proof of a significant association or cluster of significant contacts on the part of the investment trust with the State of New York to support a finding of such "presence" of the investment trust in our State as would, irrespective of other considerations, call for the application of New York law. There is no record proof of where the business of the trust is transacted, where its principal office is located or its records kept, where the trustees meet, what percentage of the investment portfolio relates to real property situate in New York, what proportion of the shareholders reside in New York State or of other facts on which a finding of such "presence" in New York State might be predicated.

The court expressly left open the question of what law would be applied in a case in which some or all of these factors dictated the application of New York law. *See, e.g., Skolnik v. Rose,* 55 N.Y.2d 964, 449 N.Y.S.2d 182, 434 N.E.2d 251 (1982); *Rottenberg v. Pfeiffer,* 86 Misc.2d 556, 383 N.Y.S.2d 189 (Sup.Ct.1976), *aff'd,* 59 A.D.2d 756, 398 N.Y.S.2d 703 (1977); *cf. Restatement (Second) of Conflicts of Laws* § 309, comment c (law of state other than state of incorporation may apply "where the corporation does all, or nearly all, of its business and has most of its shareholders in this other state and has little contact, apart from the fact of its incorporation, with the state of incorporation").

 Norlin's contacts with the State of New York are far from insubstantial. The company's principal place of business is located within the state, and its board of directors meets here. The resolution approving the contested stock issuances were adopted in this state, and the company stock has been traded on the NYSE. Whether these contacts are sufficient for a New York court to apply New York law is, in our view, a question that does not lend itself to a simple answer. We need not, however, grapple with it to resolve the present inquiry. The principles compelling a forum state to apply foreign law come into play only when a legitimate and substantial interest of another state would thereby be served. *See Intercontinental*

*Planning, Ltd. v. Daystrom, Inc.*, 24 N.Y.2d 372, 385–86, 300 N.Y.S.2d 817, 828, 248 N.E.2d 576 (1969); Traynor, Is This Conflict Really Necessary?, 37 *Tex.L.Rev.* 657, 667–70 (1959). Conversely, when the interests of only one state are truly involved, the purported conflict is purely illusory. Thus, there is no reason why the law of the forum state should not control. *See Krauss v. Manhattan Life Insurance Co.*, 643 F.2d 98, 100–101 (2d Cir.1981).

In this case, Panama apparently would refrain from applying its own law to the transactions under scrutiny, because appellant does not meet the criteria of Article 37, as interpreted by the General Attorney. In essence, Panama has made a determination that its interest in Norlin's affairs is insufficient to warrant the application of Panamanian law to this dispute. New York, as the forum state, has a more than adequate number of contacts with Norlin to give it a legitimate interest in regulating these corporate actions.

■ Moreover, it is of interest to note that the relevant rules of law in New York and Panama are identical on this point: A wholly-owned subsidiary may not vote shares of its parent's stock. In these circumstances, it would be an absurd result indeed if neither jurisdiction could apply its law, and the public policy of both should be frustrated. *See* Leflar, *American Conflicts Law* § 93, at 188 (3d ed. 1977). We therefore conclude that whatever choice of law principles would be applied, Piezo has made an adequate showing on these facts that the voting of Andean's shares would be unlawful.

B. *Voting of shares held by the ESOP*

■ We now turn to the district court's conclusion that appellee had demonstrated probable illegality stemming from the voting of Norlin shares held by the ESOP. This is a somewhat more difficult problem, for we have little statutory authority to guide us in our quest. We must look instead to those fiduciary principles of state common law which constrain the actions of corporate officers and directors.[5]

■ A board member's obligation to a corporation and its shareholders has two prongs, generally characterized as the duty of care and the duty of loyalty. The duty of care refers to the responsibility of a corporate fiduciary to exercise, in the performance of his tasks, the care that a reasonably prudent person in a similar position would use under similar circumstances. *See* NYBCL § 717. In evaluating a manager's compliance with the duty of care, New York courts adhere to the business judgment rule, which "bars judicial inquiry into actions of corporate directors taken in good faith and in the exercise of honest judgment in the lawful and legitimate furtherance of corporate purposes." *Auerbach v. Bennett*, 47 N.Y.2d 619, 629, 419 N.Y.S.2d 920, 926, 393 N.E.2d 994 (1979).

■ The second restriction traditionally imposed, the duty of loyalty, derives from the prohibition against self-dealing that inheres in the fiduciary relationship. *See Pepper v. Litton*, 308 U.S. 295, 306–07, 60 S.Ct. 238, 245–46, 84 L.Ed. 281 (1939). Once a prima facie showing is made that directors have a self-interest in a particular corporate transaction, the burden shifts to them to demonstrate that the transaction is fair and serves the best interests of the corporation and its shareholders. *See* NYBCL § 713(a)(3); *Schwartz v. Marien*, 37 N.Y.2d 487, 493, 373 N.Y.S.2d 122, 127, 335 N.E.2d 334 (1975); *Limmer v. Medallion Group, Inc.*, 75 A.D.2d 299, 428 N.Y. S.2d 961, 963 (1980); *see also* Marsh, Are Directors Trustees?, 22 *Bus.Law.* 35, 43–48 (1966).

■ In applying these principles in the context of battles for corporate control, we begin with the business judgment rule, which affords directors wide latitude in devising strategies to resist unfriendly advances. *See, e.g., Treadway Companies,*

---

5. In issues involving the fiduciary duty of a corporate board of directors, a federal court must look to state rather than federal common law. *See Burks v. Lasker*, 441 U.S. 471, 478, 99 S.Ct. 1831, 1837, 60 L.Ed.2d 404 (1979).

*Inc. v. Care Corp.*, 638 F.2d 357, 380–84 (2d Cir.1980); *Crouse-Hinds Co. v. Internorth, Inc.*, 634 F.2d 690, 701–04 (2d Cir. 1980). As Judge Kearse made clear in those cases, however, the business judgment rule governs only where the directors are not shown to have a self-interest in the transaction at issue. *Treadway*, 638 F.2d at 382. Once self-dealing or bad faith is demonstrated, the duty of loyalty supersedes the duty of care, and the burden shifts to the directors to "prove that the transaction was fair and reasonable to the corporation." *Id.; Crouse-Hinds*, 634 F.2d at 702; *Panter v. Marshall Field & Co.*, 646 F.2d 271, 301 (7th Cir.1981) (Cudahy, J., concurring and dissenting), *cert. denied*, 454 U.S. 1092, 102 S.Ct. 658, 70 L.Ed.2d 631 (1981); *Johnson v. Trueblood*, 629 F.2d 287, 300 (3d Cir.1980) (Rosenn, J., concurring and dissenting), *cert. denied*, 450 U.S. 999, 101 S.Ct. 1704, 68 L.Ed.2d 200 (1981); *see Klaus v. Hi-Shear Corp.*, 528 F.2d 225, 233–34 (9th Cir.1975); *Mobil Corp. v. Marathon Oil Co.*, [1981 Transfer Binder] Fed. Sec.L.Rep. (CCH) ¶ 98,375 (S.D.Ohio), *rev'd on other grounds*, 669 F.2d 366 (6th Cir. 1981); *cf. Bennett v. Propp*, 41 Del.Ch. 14, 187 A.2d 405, 409 (1962).

In this case, the evidence adduced was more than adequate to constitute a prima facie showing of self-interest on the board's part. All of the stock transferred to Andean and the ESOP was to be voted by the directors; indeed, members of the board were appointed trustees of the ESOP.[6] The precipitous timing of the share issuances, and the fact that the ESOP was created the very same day that stock was issued to it, give rise to a strong inference that the purpose of the transaction was not to benefit the employees but rather to solidify management's control of the company. This is buttressed by the fact that the board offered its shareholders no rationale for the transfers other than its determination to oppose, at all costs, the threat to the company that Piezo's acquisitions ostensibly represented. Where, as here, directors amass voting control of close to a majority of a corporation's shares in their own hands by complex, convoluted and deliberate maneuvers, it strains credulity to suggest that the retention of control over corporate affairs played no part in their plans.[7]

We reject the view, propounded by Norlin, that once it concludes that an actual

---

6. While a conflict of interest does not necessarily arise when directors serve simultaneously as trustees of an ESOP established by their corporation, the possibilities for such conflicts are rampant. *See, e.g., Donovan v. Bierwirth*, 680 F.2d 263 (2d Cir.1982).

7. We do not think our conclusion on this point is inconsistent with the findings in *Treadway* and *Crouse-Hinds* that no prima facie showing of conflict of interest had been made. The facts in this case differ in significant respects. *Treadway* involved the sale of 230,000 shares of Treadway Companies, Inc. stock to Fair Lanes, Inc., preparatory to a merger between the two companies. The agreement to sell the shares was reached sometime after a third party, Care Corporation, had acquired a large block of Treadway stock. Care claimed that Treadway's board had approved the sale to Fair Lanes for the improper purpose of perpetuating its control over the corporation. Judge Kearse, writing for this court, found that Care had failed to establish a conflict of interest on the part of Treadway's board. Her opinion specifically noted evidence that Fair Lanes had been interested in merging with Treadway for a number of years, that all of Treadway's directors but one anticipated losing their positions if the merger with Fair Lanes were consummated, and that the merger

was not merely a "sham or a pretext," but rather a viable business proposition. *Treadway*, 638 F.2d at 383. No analogous facts are present here.

*Crouse-Hinds* also involved a three-way competition for corporate control. In that case, Crouse-Hinds Co. and Belden Corporation entered into an agreement whereby Belden would be merged into a Crouse-Hinds subsidiary. Four days *after* the agreement was reached, Internorth, Inc. made a tender offer for Crouse-Hinds' shares, intending to follow that action with a merger of the two companies. Subsequent to the tender offer, Crouse-Hinds and Belden announced an Exchange Agreement permitting Belden shareholders to tender their shares in exchange for Crouse-Hinds stock, at the same ratio of 1.24 Crouse-Hinds shares to 1 Belden share which was contemplated in the original merger agreement. Internorth challenged the Exchange Agreement as a device by the Crouse-Hinds board to retain control. In holding that board self-interest had not been demonstrated, Judge Kearse noted that the Crouse-Hinds board had no indication that Internorth would make a tender offer at the time the merger agreement was entered into. Because the Exchange Agreement was a reasonable means of facilitating a merger which was

or anticipated takeover attempt is not in the best interests of the company, a board of directors may take any action necessary to forestall acquisitive moves. The business judgment rule does indeed require the board to analyze carefully any perceived threat to the corporation, and to act appropriately when it decides that the interests of the company and its shareholders might be jeopardized. As we have explained, however, the duty of loyalty requires the board to demonstrate that any actions it does take are fair and reasonable. We conclude that Norlin has failed to make that showing.

■ ESOP's, like other employee benefit plans, may serve a number of legitimate corporate purposes, and their creation is generally upheld in the courts when they do so.[8] *Cf. Diamond v. Davis*, 62 N.Y.S.2d 181 (Sup.Ct.1945). By establishing an ESOP, corporate managers may seek to improve employee morale and loyalty, *see Herald Co. v. Seawell*, 472 F.2d 1081, 1096 (10th Cir.1972), to raise capital for the corporation, *id.* at 1095, or to supplement employee compensation or retirement benefits, *Weinberg v. Cameron*, [1979–80 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 97,377 (D.Hawaii 1980). When an ESOP is set up in the context of a contest for

control, however, it devolves upon the board to show that the plan was in fact created to benefit the employees, and not simply to further the aim of managerial entrenchment. In applying that distinction, courts have looked to factors such as the timing of the ESOP's establishment, the financial impact on the company, the identity of the trustees, and the voting control of the ESOP shares. *See* Note, Employee Stock Ownership Plans and Corporate Takeovers: Restraints on the Use of ESOPs by Corporate Officers and Directors to Avert Hostile Takeovers, 10 *Pepperdine L.Rev.* 731, 744 (1983).

In this case, an examination of each of these factors indicates that the ESOP was created solely as a tool of management self-perpetuation.[9] It was created a mere five days after the district court refused to enjoin further stock purchases by Piezo, and at a time when Norlin's officers were clearly casting about for strategies to deter a challenge to their control.[10] No real consideration was received from the ESOP for the shares.[11] The three trustees appointed to oversee the ESOP were all members of Norlin's board, and voting control of all of the ESOP shares was retained by the directors.[12] We therefore conclude that the

---

itself legitimate, no showing of bad faith had been made. *Crouse-Hinds*, 634 F.2d at 703–04. Again, these facts are at considerable variance with those in the instant case.

**8.** Employee stock ownership plans meeting designated requirements are authorized under federal law. *See* 29 U.S.C. § 1107(d)(6); 26 U.S.C. § 401(a).

**9.** The New York Court of Appeals has long held that directors may not issue stock for the "primary purpose" of consolidating corporate control. *See Dunlay v. Avenue M. Garage & Repair Co.*, 253 N.Y. 274, 279–80, 170 N.E. 917 (1930).

**10.** Other courts have noted that the issuance of shares to an ESOP shortly after a challenge to corporate control gives rise to an inference of improper motive. *See, e.g., Klaus v. Hi-Shear Corp., supra*, 528 F.2d at 231–33; *Podesta v. Calumet Industries, Inc.*, [1978 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 96,433 (N.D.Ill.1978). Norlin also argues that the ESOP had been under consideration for some time, even though it was not created until a threat to the company emerged. No more support for that assertion

exists here than in *Hi-Shear Corp.*, 528 F.2d at 233, or *Calumet Industries*, ¶ 96,433 at 93,556.

**11.** Although a finding that the corporation received a fair price for shares transferred is not essential to establishing that a transaction is in the company's best interest, it is certainly relevant to the inquiry. *See, e.g., Buffalo Forge Co. v. Ogden Corp.*, 717 F.2d 757 (2d Cir.1983). In this case, Norlin received no cash consideration for any of the shares issued to Andean or to the ESOP.

**12.** Norlin argues that "Piezo's burden under the business judgment rule is all the heavier because the Norlin board that approved [the stock issuances] was overwhelmingly composed of independent 'outside' directors." We are not persuaded that a different test applies to "independent" as opposed to "inside" directors under the business judgment rule. *See, e.g., Zapata Corp. v. Maldonado*, 430 A.2d 779 (Del.1981); Note, "The Misapplication of the Business Judgment Rule in Contests for Corporate Control," 76 *Nw. U.L.Rev.* 980, 1001–03 (1982) and authorities

record supports the finding that the transfer of stock to the ESOP was part of a management entrenchment effort.

■ Norlin, however, urges that even if the creation of the ESOP was not fair and reasonable in itself, it served other important corporate and shareholder interests, and hence should not be deemed unlawful. First, Norlin argues that a Piezo takeover would jeopardize a $25 million net operating loss carryforward currently on the company's books. This concern appears somewhat disingenuous in light of Norlin's own statement, in a letter to the NYSE, that "[i]n Norlin's view, it is likely that Rooney Pace and Piezo, if they achieve control, could have a public sale to safeguard the net operating loss carry-forward." But even if Norlin's fears were legitimate, that would only help to justify the board's determination that an anticipated takeover attempt should be opposed as not in the corporation's best interest. It has no relevance to our evaluation whether the actions taken by the board in response to that decision were fair and reasonable. In a similar vein, the company contends that its actions were an appropriate response to reports of Rooney Pace's "unsavory reputation," and to the possibility that Norlin's financial printing business might suffer if an investment house should acquire control. Again, this concern, however real it may be, does not help to establish the independent legitimacy of the actions taken by the board to counter a perceived threat.

Norlin's final justification, and one emphasized at oral argument, was that the board needed to consolidate control to "buy" time to explore financial alternatives to a Piezo takeover. The company asserts that the shareholders will benefit if the directors are insulated from challenges to their control, for an interim period of unspecified duration, so that all of Norlin's future operations can be considered with professional guidance. This argument stands our prior cases on their heads. It is true that in conformity with the duty of care, we have required corporate managers to examine carefully the merits of a proposed change in control. We have also urged consultation with investment specialists in undertaking such analysis. *See, e.g., Treadway,* 638 F.2d at 384. The purpose of this exercise, however, is to insure a reasoned examination of the situation *before* action is taken, not afterwards. We have never given the slightest indication that we would sanction a board decision to lock up voting power by any means, for as long as the directors deem necessary, prior to making the decisions that will determine a corporation's destiny. Were we to countenance that, we would in effect be approving a wholesale wresting of corporate power from the hands of the shareholders, to whom it is entrusted by statute, and into the hands of the officers and directors.

■ We thus find that Piezo has succeeded in demonstrating the likelihood of success on the merits, with regard to the share issuances to both Andean and the ESOP.[13] We move on to the other requirement for the issuance of a preliminary injunction: a showing of irreparable harm.

### IV

Judge Edelstein based his finding of irreparable harm upon the probability that Norlin common stock would be delisted

---

cited therein. In any event, once a collective conflict of interest underlying the board's action is shown, any such distinction has no bearing on the fairness and reasonableness of the action taken.

**13.** Norlin cites the case of *Southeastern Public Service Co. v. Graniteville Co.,* C.A. No. 83–1028–8 (D.S.C. May 19, 1983), as holding that the creation of an ESOP is an appropriate step to thwart an attempt to acquire control of a corporation. The court there stated: "... as I understand the law, there is no breach of fiduci-

ary duty if you oppose a tender offer, which in the best judgment of management, is detrimental to the corporation or its shareholders, and management may take steps they deem appropriate, including issuing stock which does dilute the interest of tender offers [sic] in making self-tender offers." This is, as we have explained, a correct statement of law absent a showing of board self-interest. In this case such a showing has been made, so the *Graniteville* holding is inapposite.

from the NYSE if shareholder approval were not obtained for the stock transfers. In prior cases, we have noted the importance of NYSE listing to a corporation and its shareholders. Listing on the "Big Board" protects the liquidity of shares, and reassures shareholders and potential purchasers that the extensive NYSE listing requirements are being met. *See Sonesta Int'l Hotels Corp. v. Wellington Associates*, 483 F.2d 247, 254 (2d Cir.1973). Moreover, as we noted in *Van Gemert v. Boeing Co.*, 520 F.2d 1373 (2d Cir.1975), *cert. denied*, 423 U.S. 947, 96 S.Ct. 364, 46 L.Ed.2d 282 (1975), the investing public places great stock in these protections:

> ... [L]isting on the New York Stock Exchange carries with it implicit guarantees of trustworthiness. The public generally understands that a company must meet certain qualifications of financial stability, prestige, and fair disclosure, in order to be accepted for that listing, which is in turn so helpful to the sale of the company's securities. Similarly it is held out to the investing public that by dealing in securities listed on the New York Stock Exchange the investor will be dealt with fairly and pursuant to law.

*Id.* at 1381. *Cf. United Funds, Inc. v. Carter Products, Inc.*, [1961–64 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 91,288 (Balt.Cir.Ct. May 16, 1963) (enjoining stock issuance that would lead to loss of NYSE listing, which constituted "valuable corporate asset").

■ Norlin makes two attacks on the district judge's finding of irreparable harm. First, the company argues that its stock will suffer no loss of liquidity from NYSE delisting, because the shares are and will continue to be traded on NASDAQ, which Norlin asserts is a comparable market in all respects. At best, this undercuts only one of the three reasons for maintaining NYSE listing. It does not respond to the point that investors rely heavily upon the rules of the NYSE to insure fair dealing in corporate matters. Indeed, the fact that Norlin stock continues to be traded on NASDAQ even while it is suspended on the NYSE suggests that this investor confidence may be well placed. In addition, Norlin's assertion does not contradict Judge Edelstein's finding that "delisting of securities generally is a serious loss of prestige and has a chilling effect on prospective buyers...."

Moreover, Norlin's present cavalier attitude towards delisting [14] is belied by the company's previous actions and statements. On February 22, 1984, Norlin's corporate secretary sent an eighteen-page letter to a NYSE official, in an attempt to persuade the Exchange to continue listing its common stock. In the letter, the company suggested that dire consequences might flow from delisting:

> Any steps taken by the NYSE to delist the Common Stock at this time, while substantial legal issues remain unresolved, may be perceived (however incorrectly) as a judgment on the appropriateness of Norlin's actions and, accordingly, may tilt the balance against Norlin's position. The inadvertent result of initiating delisting proceedings could be panic selling by Norlin shareholders, probably (directly or indirectly) to Rooney Pace and Piezo, the least desired of all results, since at that point there would be no remaining opportunity to maximize the value of the remaining shareholders' investment in Norlin.

In addition, the deposition testimony of Norlin's own investment banker, Robert Pilkington, undermines the company's assertions of market interchangeability. Pilkington testified that in his discussions with Norlin's board regarding possible actions, he indicated that "the New York Stock Exchange was the premier stock exchange in the United States and many companies regarded it as an advantage to be

---

**14.** It is illuminating to compare Norlin's attitude with that of the board in the *Treadway* case. Under the original agreement governing the sale of Treadway shares to Fair Lanes, *see supra* note 5, Fair Lanes was to have had the right to "put" or resell its shares to Treadway. When the American Stock Exchange (AMEX) indicated that it would likely not list the shares in light of the "put" feature, the agreement was "promptly abandoned." 638 F.2d at 366–67.

listed on the New York Stock Exchange." Pilkington listed several advantages to NYSE listing, including the "feeling that you have a better market", the "advantage from the reputation standpoint", and the fact that the NYSE has "the advantages of the specialist system." And Pilkington conceded that delisting was "something you would not try and obtain", but that on the contrary, "You would try and maintain your New York Stock Exchange listing."

As a second argument, Norlin contends that an injunction should not have issued because that action will not prevent delisting. In addition to the stock issuances without shareholder approval, the company is out of compliance with two other NYSE listing criteria, relating to the number of publicly held shares and the number of holders of "round lots" of 100 shares or more. The district judge was well aware of this when he issued the injunction, and properly noted that "[t]his court may give relief only for violations that are appropriately before it." In any event, there is no merit to Norlin's argument. The NYSE release announcing its decision to suspend trading in Norlin stock could not have been more explicit in stating that "the decision to delist the Norlin securities results from the fact that Norlin didn't seek shareholder approval of the issuance."

Under NYSE rules, moreover, failure to comply with listing criteria does not automatically result in delisting. Section 801.-00 of the NYSE Listed Company Manual provides that "when a company falls below any criterion, the Exchange will review the appropriateness of continued listing. The Exchange may give consideration to any definitive action that a company would propose to take that would bring it in line with original listing standards." Thus, to the extent that non-compliance with the criteria might ultimately lead the NYSE to delist Norlin stock, the remedy lies within Norlin's, not Piezo's, control. Accordingly, we find no error in the district court's determination of irreparable harm.

V

In analyzing the issues presented to us, we have been mindful of the preliminary stage at which this litigation stands. Developments in corporate control contests often proceed swiftly, and timing may have a crucial impact on the outcome. A more complete record will also be required to reach a final adjudication of the merits of Norlin's and Piezo's competing claims. We would therefore urge the district judge to proceed expeditiously to a trial on the important issues raised by the parties.

This case well illustrates the increasing complexity and bitterness of the tactics employed by contestants vying for corporate dominion. As here, each new offensive may be met with a counter-offensive intended, in turn, to weaken the aggressor. When these maneuvers fail, the courts themselves are too often drawn into the fray.

Although we are cognizant that takeover fights, potentially involving billions of dollars, profoundly affect our society and economy, it is not for us to make the policy choices that will determine whether this style of corporate warfare will escalate or diminish. Our holding here is not intended to reflect a more general view of the contests being played out on this and other corporate battlefields. We do, however, believe that a preliminary injunction was warranted in this case. Whatever denouement may flow from the events that have transpired, the rules of fairness we have outlined must govern the actions taken by both sides. Because Piezo has succeeded in demonstrating probable illegality in the issuance of shares to Andean and the ESOP, as well as irreparable harm therefrom, we agree that the voting of those shares should, pending further proceedings, be enjoined. Accordingly, the order of the district court is affirmed.