COOKIES FOOD PRODUCTS, INC., an Iowa corporation, by its stockholders Leo ROWEDDER, Alvin Claussen, Sandra C. Grote, Mark Cook, Dave Tiefenthaler, Virtus Pittman, Loren Rowedder, Richard Bloom, Daryl Johnson, Charles Brotherton, Howard Brotherton, Jeryl Reiter, and Gilbert Renze, Appellants,

v.

LAKES WAREHOUSE DISTRIBUTING, INC., an Iowa corporation, Speed's Automotive, Inc., an Iowa Corporation, and Duane D. Herrig, Appellees.

No. 86–1825.

Supreme Court of Iowa.

Oct. 19, 1988.

Rehearing Denied Nov. 18, 1988.

Colin J. McCullough and David P. Jennett of McCullough Law Firm, Sac City, for appellants.

James R. Van Dyke of Van Dyke & Werden, P.C., Carroll, for appellees.

Considered by HARRIS, P.J., and SCHULTZ, NEUMAN, SNELL, and ANDREASEN, JJ.

NEUMAN, Justice.

This is a shareholders' derivative suit brought by the minority shareholders of a closely held Iowa corporation specializing in barbeque sauce, Cookies Food Products, Inc. (Cookies). The target of the lawsuit is the majority shareholder, Duane "Speed" Herrig and two of his family-owned corporations, Lakes Warehouse Distributing, Inc. (Lakes) and Speed's Automotive Co., Inc. (Speed's). Plaintiffs alleged that Herrig, by acquiring control of Cookies and executing self-dealing contracts, breached his fiduciary duty to the company and fraudulently misappropriated and converted corporate funds. Plaintiffs sought actual and punitive damages. Trial to the court resulted in a verdict for the defendants, the district court finding that Herrig's actions benefited, rather than harmed, Cookies. We affirm.

## I. *Background.*

[1] We review decisions in shareholders' derivative suits de novo, deferring especially to district court findings where the credibility of witnesses is a factor in the outcome. *Midwest Management Corp. v. Stephens,* 353 N.W.2d 76, 78 (Iowa 1984). To better understand this dispute, and the issues this appeal presents, we shall begin by recounting in detail the facts surrounding the creation and growth of this corporation.

L.D. Cook of Storm Lake, Iowa, founded Cookies in 1975 to produce and distribute his original barbeque sauce. Searching for a plant site in a community that would provide financial backing, Cook met with business leaders in seventeen Iowa communities, outlining his plans to build a growth-oriented company. He selected Wall Lake, Iowa, persuading thirty-five members of that community, including Herrig and the plaintiffs, to purchase Cookies stock. All of the investors hoped Cookies would improve the local job market and tax base. The record reveals that it has done just that.

Early sales of the product, however, were dismal. After the first year's operation, Cookies was in dire financial straits. At that time, Herrig was one of thirty-five shareholders and held only two hundred shares. He was also the owner of an auto parts business, Speed's Automotive, and Lakes Warehouse Distributing, Inc., a company that distributed auto parts from Speed's. Cookies' board of directors approached Herrig with the idea of distributing the company's products. It authorized

Herrig to purchase Cookies' sauce for twenty percent under wholesale price, which he could then resell at full wholesale price. Under this arrangement, Herrig began to market and distribute the sauce to his auto parts customers and to grocery outlets from Lakes' trucks as they traversed the regular delivery routes for Speed's Automotive.

In May 1977, Cookies formalized this arrangement by executing an exclusive distribution agreement with Lakes. Pursuant to this agreement, Cookies was responsible only for preparing the product; Lakes, for its part, assumed all costs of warehousing, marketing, sales, delivery, promotion, and advertising. Cookies retained the right to fix the sales price of its products and agreed to pay Lakes thirty percent of its gross sales for these services.

Cookies' sales have soared under the exclusive distributorship contract with Lakes. Gross sales in 1976, the year prior to the agreement, totaled only $20,000, less than half of Cookies' expenses that year. In 1977, however, sales jumped five-fold, then doubled in 1978, and have continued to show phenomenal growth every year thereafter. By 1985, when this suit was commenced, annual sales reached $2,400,000.

As sales increased, Cookies' board of directors amended and extended the original distributorship agreement. In 1979, the board amended the original agreement to give Lakes an additional two percent of gross sales to cover freight costs for the ever-expanding market for Cookies' sauce. In 1980, the board extended the amended agreement through 1984 to allow Herrig to make long-term advertising commitments. Recognizing the role that Herrig's personal strengths played in the success of their joint endeavor, the board also amended the agreement that year to allow Cookies to cancel the agreement with Lakes if Herrig died or disposed of the corporation's stock.

In 1981, L.D. Cook, the majority shareholder up to this time, decided to sell his interest in Cookies. He first offered the directors an opportunity to buy his stock, but the board declined to purchase any of his 8100 shares. Herrig then offered Cook and all other shareholders $10 per share for their stock, which was twice the original price. Because of the overwhelming response to these offers, Herrig had purchased enough Cookies stock by January 1982 to become the majority shareholder. His investment of $140,000 represented fifty-three percent of the 28,700 outstanding shares. Other shareholders had invested a total of $67,500 for the remaining forty-seven percent.

Shortly after Herrig acquired majority control he replaced four of the five members of the Cookies' board with members he selected. This restructuring of authority, following on the heels of an unsuccessful attempt by certain stockholders to prevent Herrig from acquiring majority status, solidified a division of opinion within the shareholder ranks. Subsequent changes made in the corporation under Herrig's leadership formed the basis for this lawsuit.

First, under Herrig's leadership, Cookies' board has extended the term of the exclusive distributorship agreement with Lakes and expanded the scope of services for which it compensates Herrig and his companies. In April 1982, when a sales increase of twenty-five percent over the previous year required Cookies to seek additional short-term storage for the peak summer season, the board accepted Herrig's proposal to compensate Lakes at the "going rate" for use of its nearby storage facilities. The board decided to use Lakes' storage facilities because building and staffing its own facilities would have been more expensive. Later, in July 1982, the new board approved an extension of the exclusive distributorship agreement. Notably, this agreement was identical to the 1980 extension that the former board had approved while four of the plaintiffs in this action were directors.

Second, Herrig moved from his role as director and distributor to take on an additional role in product development. This created a dispute over a royalty Herrig began to receive. Herrig's role in product development began in 1982 when Cookies diversified its product line to include taco

sauce. Herrig developed the recipe because he recognized that taco sauce, while requiring many of the same ingredients needed in barbeque sauce, is less expensive to produce. Further, since consumer demand for taco sauce is more consistent throughout the year than the demand for barbeque sauce, this new product line proved to be a profitable method for increasing year-round utilization of production facilities and staff. In August 1982, Cookies' board approved a royalty fee to be paid to Herrig for this taco sauce recipe. This royalty plan was similar to royalties the board paid to L.D. Cook for the barbeque sauce recipe. That plan gives Cook three percent of the gross sales of barbeque sauce; Herrig receives a flat rate per case. Although Herrig's rate is equivalent to a sales percentage slightly higher than what Cook receives, it yields greater profit to Cookies because this new product line is cheaper to produce.

Third, since 1982 Cookies' board has twice approved additional compensation for Herrig. In January 1983, the board authorized payment of a $1000 per month "consultant fee" in lieu of salary, because accelerated sales required Herrig to spend extra time managing the company. Averaging eighty-hour work weeks, Herrig devoted approximately fifteen percent of his time to Cookies and eighty percent to Lakes business. In August, 1983, the board authorized another increase in Herrig's compensation. Further, at the suggestion of a Cookies director who also served as an accountant for Cookies, Lakes, and Speed's, the Cookies board amended the exclusive distributorship agreement to allow Lakes an additional two percent of gross sales as a promotion allowance to expand the market for Cookies products outside of Iowa. As a direct result of this action, by 1986 Cookies regularly shipped products to several states throughout the country.

As we have previously noted, however, Cookies' growth and success has not pleased all its shareholders. The discontent is motivated by two factors that have effectively precluded shareholders from sharing in Cookies' financial success: the fact that Cookies is a closely held corporation, and the fact that it has not paid dividends. Because Cookies' stock is not publicly traded, shareholders have no ready access to buyers for their stock at current values that reflect the company's success. Without dividends, the shareholders have no ready method of realizing a return on their investment in the company. This is not to say that Cookies has improperly refused to pay dividends. The evidence reveals that Cookies would have violated the terms of its loan with the Small Business Administration had it declared dividends before repaying that debt. That SBA loan was not repaid until the month before the plaintiffs filed this action.

Unsatisfied with the status quo, a group of minority shareholders commenced this equitable action in 1985. Based on the facts we have detailed, the plaintiffs claimed that the sums paid Herrig and his companies have grossly exceeded the value of the services rendered, thereby substantially reducing corporate profits and shareholder equity. Through the exclusive distributorship agreements, taco sauce royalty, warehousing fees, and consultant fee, plaintiffs claimed that Herrig breached his fiduciary duties to the corporation and its shareholders because he allegedly negotiated for these arrangements without fully disclosing the benefit he would gain. The plaintiffs sought recovery for lost profits, an accounting to determine the full extent of the damage, attorneys fees, punitive damages, appointment of a receiver to manage the company properly, removal of Herrig from control, and sale of the company in order to generate an appropriate return on their investment.

Having heard the evidence presented on these claims at trial, the district court filed a lengthy ruling that reflected careful attention to the testimony of the twenty-two witnesses and myriad of exhibits admitted. The court concluded that Herrig had breached no duties owed to Cookies or to its minority shareholders, and found that Herrig's compensation was fair and reasonable for each of the four challenged categories of service. In summary, the court

found that: (1) the exclusive distributorship arrangement has been the "key to corporate growth and expansion" and the fees under the agreement were appropriate for the diverse services Lakes provided; (2) the warehousing agreement was fair because it allowed Cookies to store its goods at the "going rate" and the board had considered and rejected the idea of constructing its own warehouse as storage at the Lakes facility would be less expensive; (3) the taco sauce royalty agreement appropriately compenstated Herrig for the value of his recipe; and (4) the consultant fee "is actually a management fee for services rendered seven days a week" and is "well within reason, considering the success of the business." Additionally, the district court found that Herrig had withheld no information from directors or other shareholders that he was obligated to provide. The court concluded its findings with the following observation:

> The Court believes that the plaintiffs' complaint is not that they have been damaged but that they have not been paid a profit for their investment yet. There is a vast difference. Plaintiffs have made a profit. That profit is in the form of increased value of their stocks rather than in the form of dividends because of the capital considerations of operating the company.

On appeal from this ruling, the plaintiffs challenge: (1) the district court's allocation of the burden of proof with regard to the four claims of self-dealing; (2) the standard employed by the court to determine whether Herrig's self-dealing was fair and reasonable to Cookies; (3) the finding that any self-dealing by Herrig was done in good faith, and with honesty and fairness; (4) the finding that Herrig breached no duty to disclose crucial facts to Cookies' board before it completed deliberations on Herrig's self-dealing transactions; and (5) the district court's denial of restitution and other equitable remedies as compensation for Herrig's alleged breach of his duty of loyalty. After a brief review of the nature and source of Herrig's fiduciary duties, we will address the appellants' challenges in turn.

## II. *Fiduciary Duties.*

■ Herrig, as an officer and director of Cookies, owes a fiduciary duty to the company and its shareholders. *See* Iowa Code § 496A.34 (1985) (director must serve in manner believed in good faith to be in best interest of corporation); *see also Schildberg Rock Prods. Co. v. Brooks,* 258 Iowa 759, 766–67, 140 N.W.2d 132, 136 (1966) (officers and directors occupy fiduciary relation to corporation and its stockholders). Herrig concedes that Iowa law imposed the same fiduciary responsibilities based on his status as majority stockholder. *See Des Moines Bank & Trust Co. v. George M. Bechtel & Co.,* 243 Iowa 1007, 1082–83, 51 N.W.2d 174, 217 (1952) (hereinafter *Bechtel* ); *see also* 12B W. Fletcher, *Cyclopedia on the Law of Private Corporations* § 5810, at 149 (1986). Conversely, before acquiring majority control in February 1982, Herrig owed no fidicuary duty to Cookies or plaintiffs. *See* Fletcher § 5713, at 13 (stockholders not active in management of corporation owe duties radically different from director, and vote at shareholder's meetings merely for own benefit). Therefore, Herrig's conduct is subject to scrutiny only from the time he began to exercise control of Cookies.

The law commonly describes the fiduciary duties of corporate directors as twofold, consisting both of a duty of care and a duty of loyalty. *Norlin Corp. v. Rooney, Pace Inc.,* 744 F.2d 255, 264 (2d Cir.1984). Though the Iowa legislature has codified these duties, *see* Iowa Code § 496A.34 (1987), their common law antecedents still guide the court when interpreting the scope of the statute. *See* Hansell, Austin, & Wilcox, *Director Liability Under Iowa Law—Duties and Protections,* 13 J.Corp.L. 369, 373 (1988).

The duty of care requires each director to "perform the duties of a director ... in good faith, in a manner such director reasonably believes to be in the best interests of the corporation, and with such care as an ordinarily prudent person in a like position would use under similar circumstances." Iowa Code § 496A.34. If their activi-

ties meet the standard of the duty of care, directors are relieved of liability for their actions on behalf of the corporation. *See id.* ("[a] person who so performs such duties shall not have liability by reason of being ... a director").

Appellants make no claim that Herrig breached his duty of care by entering self-dealing transactions or accepting compensation for services performed in accordance with the agreements previously described. Instead, appellants claim that Herrig violated his duty of loyalty to Cookies. That duty derives from "the prohibition against self-dealing that inheres in the fiduciary relationship." *Norlin,* 744 F.2d at 264. As a fiduciary, one may not secure for oneself a business opportunity that "in fairness belongs to the corporation." *Rowen v. LeMars Mut. Ins. Co. of Iowa,* 282 N.W. 2d 639, 660 (Iowa 1979). As we noted in *Bechtel:*

> Corporate directors and officers may under proper circumstances transact business with the corporation including the purchase or sale of property, but it must be done in the strictest good faith and with full disclosure of the facts to, and the consent of, all concerned. And the burden is upon them to establish their good faith, honesty and fairness. Such transactions are scanned by the courts with skepticism and the closest scrutiny, and may be nullified on slight grounds. It is the policy of the courts to put such fiduciaries beyond the reach of temptation and the enticement of illicit profit.

243 Iowa 1007, 1081, 51 N.W.2d 174, 216 (1952). We have repeatedly applied this standard, including the burden of proof and level of scrutiny, when a corporate director engages in self-dealing with another corporation for which he or she also serves as a director. *See Holden v. Construction Mach. Co.,* 202 N.W.2d 348, 356–57 (Iowa 1972).

Against this common law backdrop, the legislature enacted section 496A.34, quoted here in pertinent part, that establishes three sets of circumstances under which a director may engage in self-dealing without clearly violating the duty of loyalty:

No contract or other transaction between a corporation and one or more of its directors or any other corporation, firm, association or entity in which one or more of its directors are directors or officers or are financially interested, shall be either void or voidable because of such relationship or interest ... if any of the following occur:

1. The fact of such relationship or interest is disclosed or known to the board of directors or committee which authorizes, approves, or ratifies the contract or transaction ... without counting the votes ... of such interested director.

2. The fact of such relationship or interest is disclosed or known to the shareholders entitled to vote [on the transaction] and they authorize ... such contract or transaction by vote or written consent.

3. The contract or transaction is fair and reasonable to the corporation.

Some commentators have supported the view that satisfaction of any *one* of the foregoing statutory alternatives, in and of itself, would prove that a director has fully met the duty of loyalty. *See* Hansell, Austin, & Wilcox, *Director Liability Under Iowa Law—Duties and Protections,* 13 J.Corp.L. 369, 382. We are obliged, however, to interpret statutes in conformity with the common law wherever statutory language does not directly negate it. *See Hardwick v. Bublitz,* 253 Iowa 49, 59, 111 N.W.2d 309, 314 (1961); Iowa Code § 4.2 (1987). Because the common law and section 496A.34 require directors to show "good faith, honesty, and fairness" in self-dealing, we are persuaded that satisfaction of any one of these three alternatives under the statute would merely preclude us from rendering the transaction void or voidable *outright* solely on the basis "of such [director's] relationship or interest." Iowa Code § 496A.34; *see Bechtel,* 243 Iowa at 1081–82, 51 N.W.2d at 216. To the contrary, we are convinced that the legislature did not intend by this statute to enable a court, in a shareholder's derivative suit, to rubber stamp *any* transaction to which a board of directors or the sharehold-

ers of a corporation have consented. Such an interpretation would invite those who stand to gain from such transactions to engage in improprieties to obtain consent. We thus require directors who engage in self-dealing to establish the additional element that they have acted in good faith, honesty, and fairness. *Holi–Rest, Inc. v. Treloar,* 217 N.W.2d 517, 525 (Iowa 1974).

### III. *Burden of Proof.*

Appellants contend that the district court improperly placed upon them the burden of proving that Herrig's self-dealing was not honest, in good faith, or fair to Cookies. The district court's ruling addressed Herrig's duties of care and loyalty in these circumstances, noting that in duty of care challenges the burden of proof is on plaintiffs because of the business judgment rule which affords directors the presumption that their decisions are informed, made in good faith, and honestly believed by them to be in the best interests of the company. *See Smith v. Van Gorkom,* 488 A.2d 858, 872 (Del.1985). The district court then noted the different burden imposed in challenges under Iowa's duty of loyalty statute, which, in its words "require[s] the *director* challenged in a self-dealing suit to carry the burden of establishing his good faith, honesty, and fairness." (Emphasis added.)

Appellants correctly assert that the business judgment rule governs only where a director is shown not to have a self interest in the transaction at issue. *Norlin,* 744 F.2d at 265; *Morrissey v. Curran,* 650 F.2d 1267, 1274 (2d Cir.1981); *Cohen v. Ayers,* 596 F.2d 733, 739 (7th Cir.1979). When self-dealing is demonstrated, "the duty of loyalty supersedes the duty of care, and the burden shifts to the director[ ] to 'prove that the transaction was fair and reasonable to the corporation.'" *Norlin,* 744 F.2d at 265 (citations omitted). We have identified and applied this reverse allocation of the burden of proof in previous self-dealing cases. *See Rowen,* 282 N.W.2d at 647; *Holi–Rest,* 217 N.W.2d at 525.

After reviewing the record in light of the district court's ruling, we are persuaded that the court appropriately recognized the shifting burdens of proof in duty of loyalty cases. By agreement of court and counsel, the plaintiffs first made out a prima facie showing that Herrig had engaged in self-dealing with Cookies. Defendants then presented witnesses and exhibits to prove that. Herrig's actions in these challenged transactions were done in good faith and with honesty and fairness toward Cookies. The plaintiffs countered with rebuttal testimony and exhibits. The mere fact that the district court credited Herrig and his evidence instead of accepting plaintiffs' contrary proof does not establish that the court improperly allocated the burden of proof. The assignment of error is without merit.

### IV. *Standard of Law.*

Next, appellants claim the district court applied an inappropriate standard of law to determine whether Herrig's conduct was fair and reasonable to Cookies. Appellants correctly assert that self-dealing transactions must have the earmarks of arms-length transactions before a court can find them to be fair or reasonable. *See Bechtel,* 243 Iowa at 1023, 51 N.W.2d at 184. The crux of appellants' claim is that the court should have focused on the fair market value of Herrig's services to Cookies rather than on the success Cookies achieved as a result of Herrig's actions.

We agree with appellants' contention that corporate profitability should not be the sole criteria by which to test the fairness and reasonableness of Herrig's fees. In this connection, appellants cite authority from the Michigan Supreme Court that we find persuasive:

> Given an instance of alleged director enrichment at corporate expense ... the burden to establish fairness resting on the director requires not only a showing of "fair price" but also a showing of the fairness of the bargain to the interests of the corporation.

*Fill Bldgs., Inc. v. Alexander Hamilton Life Ins. Co.,* 396 Mich. 453, 241 N.W.2d 466, 469 (1976). Applying such reasoning to the record before us, however, we can-

not agree with appellants' assertion that Herrig's services were either unfairly priced or inconsistent with Cookies corporate interest.

There can be no serious dispute that the four agreements in issue—for exclusive distributorship, taco sauce royalty, warehousing, and consulting fees—have all benefited Cookies, as demonstrated by its financial success. Even if we assume Cookies could have procured similar services from other vendors at lower costs, we are not convinced that Herrig's fees were therefore unreasonable or exorbitant. Like the district court, we are not persuaded by appellants' expert testimony that Cookies' sales and profits would have been the same under agreements with other vendors. As Cookies' board noted prior to Herrig's takeover, he was the driving force in the corporation's success. Even plaintiffs' expert acknowledged that Herrig has done the work of at least five people—production supervisor, advertising specialist, warehouseman, broker, and salesman. While eschewing the lack of internal control, for accounting purposes, that such centralized authority may produce, the expert conceded that Herrig may in fact be underpaid for all he has accomplished. We believe the board properly considered this source of Cookies' success when it entered these transactions, as did the district court when it reviewed them.

■ A secondary claim relating to appellants' standard-of-law argument is appellants' recurring complaint that Herrig had no right to take over control of Cookies. We find no legal or factual basis for this assertion. First, appellants presented no proof that all shareholders had agreed from the outset that no single shareholder would be allowed to acquire majority control of the company. In fact, the bylaws the board approved before Herrig assumed control belie this assertion; they provide for no restrictions on the identity of stock purchasers if the board of directors declines an offer to purchase available Cookies stock. Second, the law has long recognized the right of majority shareholders to control the affairs of a corporation, if done

so lawfully and equitably, and not to the detriment of minority stockholders. *See* 12B W. Fletcher, *Cyclopedia on the Law of Private Corporations* § 5783, at 120 (1986). The district court was correct in so holding.

## V. *Denial of Equitable Relief.*

The appellants also claim that Herrig committed equitable fraud, which entitles them to an accounting of his profits and to restitution for losses caused by his fraudulent acts. Appellants make no attempt to establish the specific elements of actionable fraud required under Iowa law. *See Grefe v. Ross,* 231 N.W.2d 863, 864 (Iowa 1975) (party claiming fraud must establish representation, falsity, materiality, scienter, intent to deceive, reliance, and resulting injury and damage by preponderance of clear, satisfactory, and convincing evidence). Rather, appellants simply assert that Herrig's failure to disclose certain information to directors and shareholders constituted an intentional fraud like that recognized by this court in *Holden v. Construction Machinery Co.,* 202 N.W.2d at 359 (in equity court, intentional acts of fraud include all acts, omissions, and concealments that involve a breach of either legal or equitable duties that injure another or give one an undue or unconscionable advantage).

While both Iowa's statutes and case law impose a duty of disclosure on interested directors who engage in self-dealing, neither has delineated what information must be disclosed, or to whom. *See* Iowa Code § 496A.34; *Midwest Management Corp. v. Stephens,* 353 N.W.2d 76, 80 (Iowa 1984) (defendant director violated fiduciary duty to disclose information "to those who have a right to know the facts" when by silence he allowed directors of corporation to believe he had agreed to purchase large block of corporate stock in exchange for corporation's investment in his broker-dealer securities investment business); *Schildberg Rock Prods. Co. v. Brooks,* 258 Iowa 759, 767–68, 140 N.W.2d 132, 137 (Iowa 1966) (failure of defendant directors to disclose seizure of corporate opportunity concerning lease agreement to majority shareholder violated fiduciary duty to corporation);

*Bechtel,* 243 Iowa at 1097, 51 N.W.2d at 225 (1952) (defendant director perpetrated fraud by concealment, silence, and violation of duty to make full disclosure to corporation). While these cases strongly encourage directors to make the fullest possible disclosure of pertinent facts to persons responsible for making informed decisions, they also suggest the court must look to the particular facts of each case to determine whether a director has violated the duty of disclosure.

■ Examining Herrig's conduct under this duty of disclosure, we find no support for plaintiffs' assertion that Herrig owed the minority shareholders a duty to disclose *any* information before the board executed the exclusive distributorship, royalty, warehousing, or consultant fee agreements. These actions comprise management activity, and our statutes place the duty of managing the affairs of the corporation on the board of directors, not the shareholders. *See* Iowa Code § 496A.34 (1987). Because the shareholders had no role in making decisions concerning these agreements, we hold that Herrig owed these shareholders no duty to disclose facts concerning any aspect of these agreements before the board entered or extended them. We also note that plaintiffs did not complain at trial that the financial reports they regularly received concerning the affairs of the company were anything less than adequate.

■ With regard to the board of directors, the record before us aptly demonstrates that all members of Cookies' board were well aware of Herrig's dual ownership in Lakes and Speed's. We are unaware of any authority supporting plaintiffs' contention that Herrig was obligated to disclose to Cookies' board or shareholders the extent of his profits resulting from these distribution and warehousing agreements; nevertheless, the exclusive distribution agreement with Lakes authorized the board to ascertain that information had it so desired. Appellants cannot reasonably claim that Herrig owed Cookies a duty to render such services at no profit to himself or his companies. Having found that the compensation he received from these agreements was fair and reasonable, we are convinced that Herrig furnished sufficient pertinent information to Cookies' board to enable it to make prudent decisions concerning the contracts.

■ Nor does Herrig's status as an "inside director" of Cookies alter our determination that he disclosed adequate information about his self-dealing. An inside director is one who also serves as an officer of the corporation and is involved in the daily management of the company. Because of the inside director's experience with company affairs, directors not so intimately involved in running the company are entitled to rely on the inside director's recommendations and opinions when making their own decisions. *See Rowen,* 282 N.W.2d at 652–53. Although our review of the record indicates that Herrig was somewhat reluctant to answer all the minority shareholders' questions concerning the board's decisions, he did not withhold any crucial information from the directors that caused the company to make unnecessarily expensive commitments in reliance on his silence, and thus has not committed equitable fraud. *Cf. Midwest Management Corp.,* 353 N.W.2d at 82; *Holden,* 202 N.W.2d at 356–60; *Schildberg Rock Prods. Co.,* 258 Iowa at 767–70, 140 N.W.2d at 136–38.

## VI. *Conclusion.*

Our resolution of plaintiffs' claims in divisions III–V of this opinion renders it unnecessary to address the district court's alleged failure to fashion appropriate equitable remedies to redress the company's loss. Like the district court, we perceive no such loss. As the court wisely reasoned,

[t]he very complaint of the Plaintiffs, that Herrig is too deeply involved in the total operation of the Cookies plant, is the reason for the success of this company. That some budgetary cuts might be made, some salaried positions filled by other persons, some additional papers could be filed when products are taken to the Speed's warehouse, are all possibilities that Herrig and the board of di-

rectors of Cookies might consider. However, these things are all conjecture and speculation. The reality here is that the Cookies company is profitable. In a time of economic disaster to many businesses and individuals in Iowa, this company is a shining example of success. The shareholders' investments have multiplied more than fourfold, jobs have been created in Wall Lake, more cash flows in and out of that community annually, and the consumers of Iowa are provided with a good product at a fair price. For this Court to tinker with such a successful venture, and especially to "punish" Herrig for this success, would be ... inequitable....

We concur in the trial court's assessment of the evidence presented and affirm its dismissal of plaintiffs' claims.

AFFIRMED.

All Justices concur except SCHULTZ, J., who dissents.

SCHULTZ, Justice (dissenting).

My quarrel with the majority opinion is not with its interpretation of the law, but with its application of the law to the facts. I would reverse the trial court's holding.

The majority opinion correctly stated the common law and statutory principles. When there is self-dealing by a majority stockholder which is challenged, the majority stockholder has the burden to establish that they have acted in good faith, honesty and fairness. This burden of fairness requires not just a showing of profitability, but also a showing of the fairness of the bargain to the interest of the corporation. I would hold that Herrig failed to sustain his burden.

In the present case, Herrig gained control of the corporation by buying a majority of the stock. His first act was to replace all of the board of directors except one, an employee of the company. From that time on, he engaged in a course of self-dealing and refused to cooperate or comply with the requests of the minority stockholders. He renewed his exclusive distributing contract, increased commissions for freight and advertising expenses, additional storage cost and his own salary, plus paid himself a royalty for taco sauce and instigated a consultation fee for himself. It was Herrig's burden to demonstrate that all of his self-dealing transactions were fair to the company.

Much of Herrig's evidence concerned the tremendous success of the company. I believe that the trial court and the majority opinion have been so enthralled by the success of the company that they have failed to examine whether these matters of self-dealing were fair to the stockholders. While much credit is due to Herrig for the success of the company, this does not mean that these transactions were fair to the company.

I believe that Herrig failed on his burden of proof by what he did not show. He did not produce evidence of the local going rate for distribution contracts or storage fees outside of a very limited amount of self-serving testimony. He simply did not show the fair market value of his services or expense for freight, advertising and storage cost. He did not show that his taco sauce royalty was fair. This was his burden. He cannot succeed on it by merely showing the success of the company.

The shareholders, on the other hand, produced testimony of what the fair market value of Herrig's services were. The majority discounts this testimony and chooses instead to focus on the success Cookies achieved as a result of Herrig's actions. They focus on the success of the company rather than whether his self-dealing actions were arms-length transactions that were fair and reasonable to the stockholders. The appellants have put forth convincing testimony that Herrig has been grossly over compensated for his services based on their fair market value. Appellant's expert witness, a CPA, performed an analysis to show what the company would have earned if it had hired a $65,000 a year executive officer, paid a marketing supervisor and an advertising agency a commission of five percent of the sales each, built a new warehouse and hired a warehouseman. It was compared with what the company actually

did make under Herrig's management. The analysis basically shows what the operating cost of this company should be on the open market when hiring out the work to experts. In 1985 alone, the company's income would have doubled what it actually made were these changes made. The evidence clearly shows that the fair market value of those services is considerably less than what Herrig actually has been paid.

Similarly, appellant's food broker expert witness testified that for $110,865, what the CPA analysis stated was the fair market value for brokerage services, his company would have provided all of the services that Herrig had performed. The company actually paid $730,637 for the services, a difference of $620,000 in one year.

In summary, I believe the majority was dazzled by the tales of Herrig's efforts and Cookies' success in these difficult economic times. In the process, however, it is forgotten that Herrig owes a fiduciary duty to the corporation to deal fairly and reasonably with it in his self-dealing transactions. Herrig is not entitled to skim off the majority of the profits through self-dealing transactions unless they are fair to the minority stockholders. At trial, he failed to prove how his charges were in line with what the company could have gotten on the open market. Because I cannot ignore this inequity to the company and its shareholders, I must respectfully dissent.