# IN THE COURT OF APPEALS OF IOWA

———————————

No. 25-0377
Filed January 7, 2026

———————————

**Greg Herrick and Jane Evans,**
Plaintiffs–Appellants,

v.

**21st Century Farms, LTD., and Thomas W. Evans and George J. Evans, Individually,**
Defendants–Appellees.

———————————

Appeal from the Iowa District Court for Wapello County,
The Honorable Myron L. Gookin, Judge.

———————————

**AFFIRMED**

———————————

Nicholas F. Miller (argued) and Jack A. Hatanpa of Brick Gentry, P.C.,
West Des Moines, attorney for appellant.

Michael S. Boal (argued) and David L. Charles of Belin McCormick, P.C.,
Des Moines, attorneys for appellees Thomas W. Evans
and George J. Evans.
Joseph Goedken and Ryan Mitchell of Orsborn, Mitchell, and Goedken,
P.C., Ottumwa, attorneys for appellee 21st Century Farms, LTD.

———————————

Heard at oral argument by Tabor, C.J., and Badding and Sandy, JJ.
Opinion by Tabor, C.J.

**TABOR, Chief Judge.**

21st Century Farms experienced "thirty-seven years of corporate harmony"—in the words of the district court—before Greg Herrick and Jane Evans sued Tom and George Evans and the family farm corporation. That lawsuit for minority shareholder oppression and breach of fiduciary duty followed requests by Greg and Jane for 21st Century Farms to buy their shares. Because Greg and Jane proved neither oppression nor breach of fiduciary duty, we affirm.

## I.    Facts and Prior Proceedings

The Evans have owned farmland in Wapello County for five generations. William Evans acquired the land in 1856. Siblings George W. Evans (Big George) and Dori Herrick are William's great grandchildren.[1] In the 1950s, Big George and Martha Evans had three children: Jane, Tom, and George. Dori Herrick had a son, Greg.

But this story takes shape in the 1980s, a decade when around one-quarter of Iowa farmers lost their land.[2] Big George joined that unfortunate cohort. Five tracts of the Evans farm faced foreclosure. Luckily, with the help of his children and nephew, Big George repurchased those tracts held by the bank. To finance the repurchase, Greg, Tom, George, and their brother-in-law Joe Bahr formed 21st Century Farms, Ltd. in 1986. The four men were

---

[1] Because several parties share last names, we use their first names. The family, along with the briefs and the district court ruling, refer to George W. Evans as Big George, so we do the same.

[2] "This was Iowa in the 1980s. The state was at the epicenter of a nationwide agriculture collapse unmatched since the Great Depression. While farms failed and banks foreclosed, rural and small-town Iowans watched and suffered, struggling to find ways to cope with the crisis." Pamela Riney-Kehrberg, *When a Dream Dies: Agriculture, Iowa, and the Farm Crisis of the 1980s* 3–4 (2022).

directors and shareholders of the family farm corporation, each owning sixty-five shares.

Now, nearly four decades later, the shareholders disagree about the motive for creating 21st Century Farms. The appellants, Greg and Jane, claim "the original primary purpose of forming 21st Century Farms to purchase the Evans Farm was a good investment opportunity, which also had the 'happy side effect' of keeping the family farm together." The Evans brothers, as appellees, believe the district court got it right. Relying on the ninth resolution in the board of directors' organizational minutes,[3] the district court found that the primary purpose for forming 21st Century Farms was "to save the historic Evans Farm by assuming the real estate contracts by which Big George and Martha Evans were able to repurchase their ownership interests in these five tracts of farmland." The district court found that secondarily the shareholders hoped for appreciation in the land's market value to allow them to buy more acres for 21st Century Farms.

In 1994, 21st Century Farms paid off the contracts and obtained title to the five parcels. That same year, Jane and Joe divorced. As part of the dissolution, the former spouses divided Joe's shares in 21st Century Farms equally, resulting in each owning 32.5 shares. Nine years later, Joe expressed his desire to sell his shares. Big George agreed that Joe should make his exit. George testified, "[Big George] wanted Joe to be bought out of the

---

[3] The organizational minutes upon which the district court relied were not signed by the directors. The district court noted that corporate formalities were "sporadic and somewhat confusing," and actions were taken without formal notice. In 1997, the shareholders sought legal advice to remedy that laxity. They all signed and unanimously consented to a chronological statement of minutes outlining actions taken between 1986 and 1997. The signed consent included the ninth resolution from the 1986 unsigned corporate minutes and noted that Jane became a director in 1995.

corporation. He was all for that." At that time, 21st Century Farms had enough cash to finance a buy-out. At their January 2004 meeting, the shareholders unanimously authorized the board of directors to buy Joe's outstanding shares for $121,000. The price was based on the middle of three appraisals (the "Bahr" method). The price did not account for transaction costs, lack of marketability, or minority status.

Two years later, 21st Century Farms bought sixty acres from a neighboring farmer. Greg testified that the shareholders didn't meet to discuss this purchase, nor was the purchase formalized in corporate minutes. In 2012, 21st Century Farms paid dividends to the shareholders, and again, according to Greg, no meeting took place nor was the action memorialized. That year was the only time the farm corporation paid dividends.

By 2017, Greg "had become frustrated with the administration of the farm" and wanted to sell his shares to 21st Century Farms. He considered selling his own land, Herrick Family Farms, to 21st Century Farms "if they were to buy me out of my interest in 21st Century Farms after that purchase." Herrick Family Farms abutted the property held by 21st Century Farms. A purchase contract was drawn up for that sale, but Greg ultimately decided not to sell the Herrick Family Farms. He explained at trial, "It became increasingly clear to me that my interest in leaving the corporation was not going to be accomplished even if I sold this land to them, which I believe they wanted to add to the farm." Instead, Greg focused on a buy-out from 21st Century Farms. But no deal ever materialized.

By the shareholder meeting in 2021, no buy-out had taken place. During that meeting, Greg suggested the corporation use the same methodology for facilitating his exit as it did for Joe's departure. Greg was open to other options too, such as his financing of the purchase or just

dividing the land between the shareholders. With no resolution, the topic resurfaced for discussion at their February 2023 meeting. By this time, Jane had also sought an exit from 21st Century Farms and urged that Joe's buyout was a good model. Jane testified: "We set a precedent by buying Joe Bahr out, so, yes, to my knowledge, that was the method that we were familiar with and felt should be fair for all shareholders."

The discussions during the February 2023 meeting about an exit for Greg and Jane "degenerated into a very heated conversation." According to Greg, the shareholders did not vote on the matter because "Tom said that he and George had the majority. So it didn't matter. They're not going to do it. The farm wasn't for sale. They didn't want to purchase the farm." Greg also claims, "Tom said if you want to sue us, sue us." But the minutes, drafted by Jane, do not mention a lawsuit. Likewise, the minutes do not reflect any formal offer by Jane and Greg to tender their shares to 21st Century Farms but do reflect that they "raised the topic of an exit or liquidation strategy." Tom responded "that any shareholder is free to sell his or her shares to a current shareholder or outside party. Representing the majority ownership, Thomas Evans and George Evans stated that the corporation is not buying any shares."

At this meeting, they also reinvested 21st Century Farms cash to provide a higher rate of return—at Greg's suggestion. Before the February 2023 meeting, all actions taken had been joint and unanimous decisions. According to minutes for the February meeting, the shareholders and the board unanimously consented to prior business and actions.

With no more discussions within the corporation, Greg and Jane sued Tom, George, and 21st Century Farms in May 2023. They alleged minority shareholder oppression and breach of fiduciary duty and requested judicial

dissolution of the corporation under Iowa Code section 490.1430 (2023). Trial occurred one year later. Tom, George, and 21st Century Farms moved for a directed verdict; the district court reserved ruling. In October 2024, Jane and Greg moved to reopen the record and requested an evidentiary hearing. The district court took that issue under advisement.

Later, the court denied both the motion to reopen the record and the motion for a directed verdict. As for the three substantive claims, the court found (1) no oppressive conduct occurred, (2) judicial dissolution of 21st Century Farms was unavailable as a remedy, and (3) Jane and Greg failed to meet their burden to prove breach of fiduciary duty. The district court dismissed the petition.

Jane and Greg appeal. They claim the district court erred in six ways: (1) by denying their motion to reopen the record, (2) by applying the wrong standard in its minority shareholder oppression analysis, (3) by applying the business judgment rule, (4) by failing to find minority shareholder oppression, (5) by failing to find breach of a fiduciary duty, and (6) by admitting reports and testimony from defense experts.

## II. Analysis

We organize those six claims into four sections. First, we address minority shareholder oppression (grouping together related claims (2) through (4)). Second, we analyze the admission of the defense expert reports and testimony. Third, we decide whether the court should have reopened the record. And finally, we analyze its finding of no breach of fiduciary duty.

## A. Did Greg and Jane prove minority shareholder oppression?

When claims of minority shareholder oppression are tried in equity, our review is de novo. *Baur v. Baur Farms, Inc.*, 832 N.W.2d 663, 668 (Iowa 2013). In a closely held corporation, directors and majority shareholders owe fiduciary duties to the company and its shareholders, including the duty to "conduct themselves in a manner that is not oppressive to minority shareholders." *Id.* at 673–74.[4]

In determining what constitutes "oppressive" conduct, our supreme court adopted a "reasonableness standard." *Id.* at 673. We must ask "whether the reasonable expectations of the minority shareholder have been frustrated under the circumstances." *Id.* at 674. *Baur* declined to catalogue all circumstances in which the frustration of reasonable expectations constitutes oppression but held "majority shareholders act oppressively when, having the corporate financial resources to do so, they fail to satisfy the reasonable expectations of a minority shareholder by paying no return on shareholder equity while declining the minority shareholder's repeated offers to sell shares for fair value." *Id.* But *Baur* cautioned against "giving the

---

[4] Under Iowa Code section 490.1430(1)(b)(2), a shareholder can seek dissolution when "those in control of the corporation have acted, are acting, or will act in a manner that is illegal, oppressive, or fraudulent." Upon a finding of oppression, the corporation or its shareholders can avoid dissolution if they "elect to purchase all shares owned by the petitioning shareholder at the fair value of the shares" under Iowa Code section 490.1434(1). The parties then may reach an agreement as to the fair value of the shares. *Id.* § 490.1434(3). If they fail to reach an agreement within sixty days, the court shall stay proceedings and determine the fair value "as the court deems appropriate under the circumstances." *Id.* § 490.1434(4). After fair value is determined by either the parties or the court, the court "shall dismiss the petition to dissolve the corporation . . . and the petitioning shareholder shall no longer have any rights or status as a shareholder of the corporation." *Id.* § 490.1434(6).

minority a foothold that is oppressive to the majority" when determining relief. *Id.* at 678.[5]

In rejecting the claim of oppression, the district court made three key findings. First, it found the primary purpose in forming 21st Century Farms was to save the family farm from foreclosure. Built into this goal was the shareholders' hope that the farmland would appreciate and generate cash, which would allow them to buy more farmland. Notably, the district court found, "Regular return on their investment was neither expected nor experienced by the shareholders." Second, the court found no formal offers by Jane and Greg to sell their shares. Instead, there had been "informal discussions . . . regarding their desire to liquidate their ownership interest in 21st Century Farms." Third, the court found the Evans brothers' refusal to allow the corporation to buy out Jane and Greg reflected adherence to the business judgment rule to protect 21st Century Farms "from valuing and purchasing stock back at a value higher than demanded by law." And so, the district court found no minority shareholder oppression.

*Reasonable Expectations Standard.* As their first critique, Jane and Greg claim the district court erred in focusing on the majority shareholders' subjective expectations, especially those of George, rather than the minority shareholders' objective expectations. Our supreme court has not spoken on the subjectivity or objectivity of this analysis, but it has provided guidance for

---

[5] Before further analyzing the claim of minority shareholder oppression, we acknowledge the possible fluidity in which shareholders could be in the majority or minority for different decisions by this family farm corporation. Recall that Tom, George, and Greg each own 65 shares, while Jane owns 32.5 shares after her divorce. Greg and Jane assert that Tom and George constituted a controlling majority voting bloc. At oral argument, their counsel emphasized that the brothers "voted in lockstep all the time." We accept that they are the majority shareholders for purposes of this case.

determining a minority shareholder's reasonable expectations. We ask if the expectation:

> (i) contradicts any term of the operating agreement or any reasonable implication of any term of that agreement; (ii) was central to the plaintiff's decision to become a member of the limited liability company or for a substantial time has been centrally important in the member's continuing membership; (iii) was known to other members, who expressly or impliedly acquiesced in it; (iv) is consistent with the reasonable expectations of all the members, including expectations pertaining to the plaintiff's conduct; and (v) is otherwise reasonable under the circumstances.

*Barkalow v. Clark*, 959 N.W.2d 410, 418 (Iowa 2021) (quoting *Manere v. Collins*, 241 A.3d 133, 156–57 (Conn. App. Ct. 2020).

We find no fault in the district court's analysis of the minority shareholders' reasonable expectations. Along with testimony at trial, the court considered 21st Century Farms's formation resolution outlined in the original organizational minutes, which authorizes 21st Century Farms to assume and pay the five real estate contracts on the Evans farmland. *See id.* at 419 ("[Founding] documents are a major determinant of a member's reasonable expectations.").

In arguing the corporation's primary purpose was "an investment for the shareholders" from which "a buy-out would be facilitated," Jane and Greg highlight Tom's use of "investment" in referring to 21st Century Farms. But the district court accounted for that reference. The court found a secondary aim of 21st Century Farms was for the land to appreciate in value so the shareholders could accumulate cash to buy more farmland. And while Jane and Greg contend the court focused too much on the majority shareholder expectations, the fourth factor outlined in *Barkalow* permits the

court to consider the reasonable expectations of all the shareholders, not just of the minority shareholders. *Id.* at 418.

As more proof that their expectation to cash out is reasonable, Jane and Greg point to Joe's buyout. But testimony suggests there were other influences explaining the corporation's ready acceptance of Joe's request: Big George's desire to "get [ Joe] out" after his divorce from Jane. So after weighing the *Barkalow* factors and deferring to the district court's credibility findings, we find the district court properly applied the reasonable expectations standard.

*Business Judgment Rule.* Jane and Greg next contend the district court erred in finding the business judgment rule applies to protect the majority shareholders' refusal to buy Greg's shares under the formula used to buy out Joe. The district court reasoned that "the method used to value Joe's shares for purchase would result in a higher price than the 'fair value' that the court is required to use [under section 490.1434] in valuing such interests when the parties cannot otherwise agree." The court continued:

> Thus, Tom's and George's refusal to acquiesce in Greg's proposed sales price method more accurately reflects adherence by them to the "business judgment rule" to protect the Farm Corp from valuing and purchasing stock back at a value higher than demanded by law. Conversely, it does not reflect oppressive behavior by Tom and George against Greg and Jane.

The business judgment rule is the standard used to measure directors' actions. *Hanrahan v. Kruidenier*, 473 N.W.2d 184, 186 (Iowa 1991). "When directors act in good faith in making a business decision, when the decision is reasonably prudent, and when the directors believe it to be in the corporate interest, there can be no liability." *Id.* This rule prevents excessive judicial interference and prevents courts from "secondguessing . . . business

10

decisions which have been made by those whom the corporation has chosen to make them." *Id.*

But Jane and Greg caution against using the business judgment rule in a minority shareholder oppression suit. They warn that it would allow majority shareholders to take advantage of these procedures and buy out minority shareholders at a lower price than the minority shareholder originally sought. To counter, Tom and George identify a fatal flaw in that scenario: it presupposes that minority shareholders are entitled to be bought out at a price higher than fair value.

This debate necessitates a discussion of fair value. Section 490.1434 doesn't define "fair value." Instead, we borrow language from appraisal rights provisions in the same code chapter. *Guge v. Kassel Enters.*, 962 N.W.2d 764, 770 (Iowa 2021). There, fair value is determined "[u]sing customary and current valuation concepts and techniques generally employed for similar businesses in the context of the transaction requiring appraisal," and "[w]ithout discounting for lack of marketability or minority status." Iowa Code § 490.1301(3)(b)–(c).

In *Guge*, the court used a "net asset value approach" because it was a closely held corporation in which "an overwhelming proportion of the entity's value rested in its farmland holdings as opposed to income generated in ongoing operations." 962 N.W.2d at 771. *Guge* also held that the net asset determination should have included transaction costs based on a hypothetical liquidation of the assets. *Id.* at 771–72. The parties' experts in *Guge* agreed that deduction of transaction costs was appropriate, so this is not a bright line rule. *See Walker v. Daniels*, No. 23-0711, 2024 WL 2308699, at *7 (Iowa Ct. App. May 22, 2024) (neglecting to deduct transaction costs when the parties disagreed and one expert was more persuasive than the other). But, notably,

"tax consequences should be considered 'only in the most limited circumstances,' which in most cases means 'only when a sale of those assets is imminent and unrelated to the transaction' that triggered the petitioning shareholders' action." *Guge*, 962 N.W.2d at 773 (citation omitted). Thus, the fair value of shares in a closely held corporation focused on farmland should be calculated using a net asset value approach. It should account for transaction costs in a hypothetical liquidation of the assets if the parties agree or upon persuasive expert testimony, and it should not account for tax consequences unless sale is imminent.

With this definition of fair value in mind, we agree with Tom and George that shareholders seeking to liquidate their stock cannot reasonably expect a price above fair value from the farm corporation. A corporation should be protected when it rejects an offer to buy shares at a price above fair value. We find no mistake in applying the business judgment rule here.[6]

*Minority Shareholder Oppression.* Having addressed Jane and Greg's two complaints about the district court's minority-shareholder-oppression analysis, we move to their disagreement with the court's ultimate finding of no oppression.

In rejecting the claim of minority shareholder oppression, the district court emphasized the hasty nature of this action. "Less than three months

---

[6] We recognize that "the business judgment rule governs only where a director is shown not to have a self interest in the transaction at issue." *Cookies Food Prods., Inc., by Rowedder v. Lakes Warehouse Distrib., Inc.*, 430 N.W.2d 447, 453 (Iowa 1988). Greg and Jane allege that George and Tom engaged in self-dealing by reimbursing their attorney fees from corporate funds. But that allegation depends on reopening the record, which the district court refused to do. So we may employ the business judgment rule here. *See Van Horn v. R.H. Van Horn Farms, Inc.,* No. 17-0324, 2018 WL 3060240, at *7 (Iowa Ct. App. June 20, 2018).

12

after [the February 2023] meeting, this lawsuit claiming minority shareholder oppression against Tom and George was filed by Greg and Jane. Up to that time, only informal discussions had occurred regarding their desire to liquidate their ownership interest in the Farm Corp." The court did not view the Evans brothers as having ruled out all future buy-out discussions.

> The court acknowledges that Tom and George have indicated the corporation is not interested in buying out Greg and Jane, but it appears what precipitated them taking that position was an inability to reach any agreement on price or how it should be calculated. No formal offers were ever made by Greg and Jane to the Farm Corp to buy their shares. The informal discussions that occurred with Greg about buying his shares broke down because he demanded using the same sales price method as was used with Joe (fair market value of the farmland plus the cash in the Farm Corp times ownership interest).

In our de novo review, we agree that a finding of oppression would be premature on this record. Jane and Greg did not prove that the Evans brothers' conduct rose to a level of oppression mandating dissolution. As their counsel conceded at oral arguments, Jane and Greg never made a formal offer to sell their shares with any dollar amounts included. Rather, they pursued informal discussions about their desire to liquidate their interests in 21st Century Farms. These interactions were a far cry from "the minority shareholder's repeated offers to sell shares for fair value" in *Baur*. 832 N.W.2d at 674.

Yet Jane and Greg urge us to consider the informal actions of the majority shareholders. They note "the history of 21st Century Farms reveals a corporation characterized by informality." But even if we did consider their informal actions, we still have no price to consider. Jane and Greg insist the corporation should have followed the "Bahr method." But they never used that method to reach a price, nor did they present "fair value" evidence at

trial.[7] With no price in front of us, we cannot evaluate whether a hypothetical offer was fair value. Beyond that, *Baur* requires that the corporation have the financial resources to facilitate such a sale. *Id.*. According to this record, 21st Century Farms would have to sell farmland or incur significant debt to buy out Jane and Greg.

Lastly, Jane and Greg allege minority shareholder oppression in another way. They claim that they were improperly removed from the board of directors. But the record shows otherwise. They completed their terms and were serving holdover terms until the next board was elected.

Like the district court, we find no minority shareholder oppression.

## B. Did the district court err in allowing defense expert evidence?

Jane and Greg contest the district court's decision to admit evidence from two experts designated by Tom and George. Tom and George identified Darrell Limkeman and Bradley Barnes as expert witnesses in November 2023. Limkeman is a farm manager and certified general property appraiser. Barnes is the accountant for 21st Century Farms. Jane and Greg claim reports for these experts "were not even referenced until 24 and 12 days before trial in amended designations." But Tom and George allege they provided Limkeman's primary report to Jane and Greg in March 2024, almost two months before trial. Tom and George amended Limkeman's expert designation in April 2024 "to better reflect the topics on which he would

---

[7] An expert for Tom and George testified the fair value of Jane's interest was $545,062 and Greg's interest was $1,090,124. That expert deducted for transaction costs and tax consequences. Jane and Greg contend that calculation was incorrect because it included tax consequences. On this point, we agree. With no imminent sale, capital gains tax consequences should not have been considered. *See Guge*, 962 N.W.2d at 773.

testify."[8] As to Barnes, Tom and George listed his expected testimony with the initial witness designation. But after realizing Jane and Greg would not be presenting evidence on the fair value of their shares, Tom and George notified them about six weeks before trial that they would ask Barnes to prepare that valuation. Tom and George amended their expert designation for Barnes on May 8, to reflect that Barnes would testify to valuing shares in 21st Century Farms. They provided Jane and Greg with a report as soon as Bradley completed it, less than a week later. Trial started May 21.

We review the district court's decision to admit this expert testimony for an abuse of discretion. *Ranes v. Adams Lab'ys, Inc.*, 778 N.W.2d 677, 685 (Iowa 2010). We reverse only if the court's exercise of discretion is based on untenable grounds or is clearly unreasonable. *Id.*

Witnesses retained to provide expert testimony must provide a written report. Iowa R. Civ. P. 1.500(2). "Any additions or changes to this information must be disclosed no later than 30 days before trial." *Id.* at r. 1.508(3). When a party fails to comply with these requirements, the information is inadmissible "unless the failure was substantially justified or is harmless." *Id.* at 1.517(3)(a).

True, Tom and George missed the deadline for amending their expert designations. But the failure was justified and harmless. As to Limkeman's amended disclosure, Tom and George added just one topic. Jane and Greg had three weeks to review and prepare. As for Bradley's report, a discussion of fair value was crucial to the litigation. Jane and Greg had to show the buy-out of their shares would be at fair value and thus reasonably expected. When they failed to offer evidence of fair value, Tom and George filled that void.

---

[8] It added one topic: the costs of selling the property owned by the corporation.

Because the delays were either harmless or necessary to ensure a fully developed record, we find the district court acted within its discretion in allowing the expert testimony.

## C. Did the district court err in declining to reopen the record?

In October 2024, nearly five months after a two-day trial in May, Jane and Greg moved to reopen the record and requested an evidentiary hearing to introduce seven exhibits.[9] They sought to introduce evidence to show that Tom and George (1) authorized 21st Century Farms to reimburse their attorney fees, (2) called a secret special shareholder meeting and imposed a fee-shifting bylaw, and (3) improperly removed Jane and Greg from the board of directors. The district court denied their motion, stating: "Finality is more important than allowing the parties to air new or ongoing grievances."

"Rulings on . . . motions to reopen evidence are discretionary and are, therefore, reviewed for an abuse of discretion." *Homeland Energy Sols., LLC v. Retterath*, 938 N.W.2d 664, 684 (Iowa 2020). To find an abuse of discretion, we must decide that the district court's "discretion was exercised on grounds or for reasons clearly untenable or to an extent clearly

---

[9] The exhibits they sought to introduce are:
- Exhibit 32: A register from 21st Century Farms savings account showing payment of attorney fees;
- Exhibits 33 and 34: Affirmations and undertakings by Tom and George authorizing 21st Century Farms to reimburse their attorney fees;
- Exhibit 35: An email from Tom detailing actions taken at a special board of directors meeting on September 5, 2024;
- Exhibit 36: The minutes of a special board meeting held on April 12, 2024;
- Exhibit 37: An attorney fee-shifting amendment to incorporate bylaws passed at the September special board meeting; and
- Exhibit 38: Email and letters evidencing minority shareholders' requests for and receipt of corporate documents evidencing attorney fee payments.

unreasonable." *State v. Teeters*, 487 N.W.2d 346, 349 (Iowa 1992) (quoting *State v. Morrison*, 323 N.W.2d 254, 256 (Iowa 1982)).

In deciding whether to reopen a case, the district court must weigh these factors:

> (1) the reason for the failure to introduce the evidence; (2) the surprise or unfair prejudice inuring to the opponent that might be caused by introducing the evidence; (3) the diligence used by the proponent to secure the evidence in a timely fashion; (4) the admissibility and materiality of the evidence; (5) the stage of the trial when the motion is made; (6) the time and effort expended upon the trial; and (7) the inconvenience reopening the case would cause to the proceeding.

*Id.* at 348. Here Jane and Greg argue the district court abused its discretion by only considering factors (5), (6), and (7). They contend the court overlooked factors (1) through (4). They focus on factor (4)—the materiality of the proposed evidence—but also address the timing of their motion and the reasons they didn't present the evidence at trial.

Granted, the district court must "balance all seven factors; no one factor is controlling or tips the scale." *Long v. State*, No. 15-1231, 2017 WL 514400, at *3 (Iowa Ct. App. Feb. 8, 2017). But we disagree that the court ignored the first four factors. The district court wrote: "In weighing the factors outlined in *Teeters*, particularly factors (5), (6) and (7), the court concludes that re-opening the record to complain of these matters happening after trial and matters ongoing is a slippery slope this court will not start down." Placing greater emphasis on three issues does not mean the court did not balance all seven factors.

The district court did not abuse its discretion by highlighting factors (5), (6), and (7). To the contrary, the analysis is flexible: "No rigid or fixed formula can or should be employed to determine when a motion to reopen is

17

proper since the trial court . . . can best determine what is necessary and appropriate to achieve substantial justice." *Bangs v. Maple Hills, Ltd.*, 585 N.W.2d 262, 267 (Iowa 1998) (citation omitted). For example, in *Teeters*, the supreme court found that even though "[a]t least some of these factors militate in favor of reopening" and the proffered testimony was valuable, the district court did not abuse its discretion in prioritizing the judicial administration of the trial calendar. 487 N.W.2d at 349.

We also question whether the proposed exhibits were material and the reason for failing to introduce some of them at trial. Jane and Greg claim the proffered evidence supports their claims for minority shareholder oppression, judicial dissolution, and breach of fiduciary duty. But we find otherwise. Regarding attorney fees, Jane and Greg knew before trial that the corporate board agreed to advance and reimburse legal fees for George and Tom. But Jane and Greg did not try to introduce that evidence until after the trial. What's more, chapter 490 permits fee reimbursement. *See* Iowa Code §§ 490.850, 490.859. As to proposed Exhibit 37, the bylaw applies only to future suits.

Given the flexibility in the analysis, we do not find that the district court acted clearly unreasonably or relied on untenable reasons. We affirm the denial of the motion to reopen evidence.

### D. Did Greg and Jane prove breach of fiduciary duties?

As their final claim, Jane and Greg contend the district court should have found that Tom and George breached their fiduciary duties. We review de novo. *Barkalow*, 959 N.W.2d at 418. The parties agree that Tom and George owed fiduciary duties of care and a duty of loyalty to the corporation and its shareholders. *Baur*, 832 N.W.2d at 673–74.

Most of their breach-of-fiduciary-duty analysis echoes their minority-shareholder-oppression argument. Indeed, Greg and Jane recognize that the two claims are "closely linked" and argue the majority shareholders "engaged in numerous oppressive actions." Because the duty to not act oppressively follows the reasonable expectations analysis above, we need not repeat it here.

Greg and Jane also argue the majority shareholders failed to act in good faith by "taking repeated actions out of a desire to punish" the minority shareholders. Their reference to punishment is too vague to address. And without more explanation, they suggest Tom and George breached the duty of loyalty "by engaging in self-dealing and paying their own attorney fees out of corporate funds." But evidence to support self-dealing was absent because the district court did not reopen the record.

Thus, like the district court, we find no breach of fiduciary duty.

## III.    Conclusion

To recap, Jane and Greg failed to show minority shareholder oppression or a breach of fiduciary duty by George and Tom. The district court properly decided the other issues appealed.

**AFFIRMED.**