# IN THE SUPREME COURT OF IOWA

No. 22–0259

Submitted February 21, 2024—Filed April 19, 2024

**BRIAN HORA** and **GREGG HORA,** Individually and on Behalf of
**HORA FARMS, INC.,** and **PRECISION PARTNERS, CORP.,**

Appellants,

vs.

**KEITH HORA** and **KURT HORA,** Individually and in Their Capacity as
Shareholders, Directors, Officers, Managers, and Employees of
**HORA FARMS, INC., HEATHER HORA,** and **HK FARMS, INC.,**

Appellees.

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Washington County, Sean W. McPartland, District Court Judge.

Defendants in derivative shareholder action seek further review of court of appeals reversal of district court judgment dismissing all claims. **DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT JUDGMENT AFFIRMED.**

Oxley, J., delivered the opinion of the court, in which all justices joined.

John F. Lorentzen (argued) of Nyemaster Goode, PC, Des Moines, and Sarah J. Gayer of Nyemaster Goode, PC, Cedar Rapids, for appellants.

Abram V. Carls (argued) and Stephen J. Holtman of Simmons Perrine Moyer Bergman PLC, Cedar Rapids, for appellee Keith Hora.

Joseph W. Younker (argued) and Matthew G. Barnd of Bradley & Riley PC, Iowa City, for appellees Kurt Hora, Heather Hora, and HK Farms, Inc.

**OXLEY, Justice.**

Family farms are as Iowan as baseball is American. Passing family farms on to the next generation takes planning, and structuring a farm into a corporation with shares that can be gifted and passed down is a common method of doing so. But with incorporation comes corporate responsibilities to shareholders. This appeal involves a not-so-uncommon clash between one generation and the next over the best ways to operate a family farm.

Two brothers brought this derivative action as minority shareholders in a family farming corporation against their dad and brother, claiming that they breached fiduciary duties owed to the corporation based on their management of the farming operation. Following an eleven-day bench trial, the district court entered a thorough order detailing its factual findings and concluding that neither defendant breached fiduciary duties owed to the corporation. On its de novo review, the court of appeals took a very different view of the evidence and reversed the district court with respect to two specific issues. On further review, we vacate the court of appeals decision and affirm the district court.

## I. Background.

This case involves members of the Hora family. To keep the players straight, we start with an overview of the Hora family tree. George and his wife Marie are at the top. They have three children: Keith, Kathy, and Kevin. As relevant to this case, Keith married Celeste, and they have six children: Gregg, Brian, Kurt, Dana, Darren, and Heidi. Two of those children—Gregg and Brian—are the plaintiffs. They sued Keith, their father, and Kurt, their brother.

George Hora farmed in Washington County with his son Keith and incorporated his farming operation as "Hora Farms, Inc." (HFI) in 1974. The HFI Articles of Incorporation provided for only two directors, and Keith has always been one of them. George served as a director from 1974 until he was replaced by

Keith's wife Celeste in 1977. Celeste served as a director until her cancer diagnosis in 1985 when she was replaced by George, who continued to serve as a director until his death in 1995. After George's death, Marie (George's wife and Keith's mother) served as a director alongside Keith until her death at the age of ninety-nine in March 2015. Keith was the secretary of HFI from 1975 until 2016, and he has been its president since 1995 following George's death. At all relevant times, Keith has personally guaranteed HFI's debts.

Initially, HFI only had one class of shares (Class A), which were voting shares equally held by George, his wife Marie, his son Keith, and Keith's wife Celeste. In 1977, HFI amended its Articles of Incorporation and issued shares of nonvoting stock (Class B) in equal amounts to George, Marie, Keith, and Celeste. The Class B shares were issued so they could be gifted to other family members without affecting control of the corporation.

Kathy and Kevin, Keith's younger siblings, were gifted Class A and Class B shares of HFI when their parents passed away. Kathy is not involved in farming, and Kevin—who is twenty years younger than Keith—farms on his own in Washington County. Keith's wife Celeste passed away in 1989, and her will created the "Celeste Hora Trust," naming Keith as its trustee. The Trust's primary asset is the shares of HFI stock owned by Celeste at the time of her death. Keith has a life estate in the Trust, and each of Keith and Celeste's children have remainder interests.

At the time of trial, Keith owned 42% of the Class A voting shares of HFI individually and controlled an additional 25% of those shares through his role as trustee of Celeste's Trust. Kathy and Kevin (Keith's siblings) each own 16.5% of the Class A voting shares, which make up the remaining Class A shares not owned or controlled by Keith. Of the nonvoting Class B shares, Keith owned 24%, Celeste's Trust owned 24%, Kathy and Kevin each owned 15%, and Keith and

Celeste's six children—including Gregg and Brian—each owned a little over 3.5%.

HFI owns 1,075 acres of farmland where it grows corn and soybeans. HFI has not raised livestock since the 1980s. Keith's three oldest sons—Gregg, Brian, and Kurt—each attended Iowa State University and received agriculture-related degrees before returning home to farm HFI with Keith. While running their own farming operations, each son also served as HFI's operations manager at different points in time and received similar benefits from HFI as part of their compensation. They used HFI equipment rent-free for their own operations, they used HFI corn to feed their own hogs, and they stored their own corn in HFI grain bins, which was commingled with HFI's corn. Gregg, the eldest, returned home from Iowa State University in May 1982. He farmed with Keith until August 1985, when he moved to Ft. Dodge to farm with his in-laws. Brian, the second eldest, took over as operations manager after graduating from Iowa State in 1985, and he continued in that role until 2000. Brian's personal farming operation is incorporated as "Precision Partners Corp." Following in his older brothers' footsteps, Kurt graduated from Iowa State in 1988 and then worked on the HFI farm under Brian. Kurt and Brian had a contentious working relationship, which reached a boiling point in the fall of 2000 when they argued about whether Kurt's soybeans should be harvested before HFI's corn. After that argument, Brian quit as operations manager, and Keith fired Kurt. In early 2001, Keith asked Kurt to come back to operate HFI, and Kurt agreed on the condition that Brian was not involved.

From 2001 through 2015, Kurt worked as the operations manager of HFI. Keith was also heavily involved in the farming operation during that time. Kurt had his own farming operation with his wife Heather, HK Farms, Inc., where he grew corn and ran a hog finishing operation that raised pigs from weanlings to

market weight. During this time, Brian owned and farmed around 850 acres through Precision Partners and rented another 230 acres of cropland from HFI. As noted, Gregg was farming near Fort Dodge and was not involved with HFI at all during this time.

While he was still acting as operations manager, Brian drafted Kurt's employment contract for the period of January 1 to December 31, 2000, which Kurt continued to use as his employment agreement—even after he moved into the position of operations manager—until a new contract was drafted in 2017. Kurt's original employment contract from 2000 was similar to Brian's previous employment agreement, and both provided that a portion of their respective compensation would be "paid in grain used, stored, or sold in employees name."

In 2015, Brian and Gregg became concerned about the operation of HFI after they received recent financial information for HFI while assisting Keith with estate planning. Keith was also working with an estate planning attorney and a farm business consultant during this time. At Keith's request, Gregg took over the open HFI director position in the spring of 2015 following his grandmother's death.

When Brian and Gregg started digging into HFI's finances, they became concerned that Keith and Kurt did not have a good grasp on the farm's operations, particularly its poor working cashflow. Recent tax returns showed operating losses for HFI, and its outstanding loan balances were on the rise. However, one of the biggest points of contention involved the lack of documentation concerning HFI's corn inventory.

On May 25, 2015, a family meeting was held to discuss the future of HFI and quell the rising tensions among family members. At the meeting, Keith reviewed the history of the family farm and stressed the importance of the farm's legacy, which was built on his and his father's sacrifices and hard work. The

family discussed discrepancies in the grain inventories; concerns over operating losses, rising debt, and insufficient working capital; and concerns about inadequate documentation, lack of transparency, and mistrust. These were not new concerns. As revealed by notes from a 1994 family meeting, Brian had raised similar complaints about commingling and using HFI corn in other operations twenty years prior.

The biggest point of contention involved tracking the HFI corn inventory. As operations manager, Kurt used annual year-end settlement sheets to account for grain inputs, production, sales, and inventory and to reconcile the use of his personal equipment and farmhands for HFI's benefit against expenses paid by HFI for Kurt's benefit. As operations manager, Kurt—like Gregg and Brian before him—commingled his own corn with corn grown by HFI and Kevin (Keith's brother) in HFI's grain bins. Kurt allocated the corn in the bins between the three of them based on readings from the combines as the corn was harvested from their respective farms rather than weighing the corn as it was put into the bins. Also, like his brothers before him, Kurt used some of HFI's corn to feed his hogs, which was consistent with the terms of his employment contract. In 2001 and 2002, Kurt recorded the corn he removed from the grain bins to feed his hogs each month by weight. In 2003, Keith agreed to allow Kurt to stop weighing the corn and instead utilize a formula based on the assumption that Kurt fed nine bushels of corn to each hog that reached market weight. The nine-bushel assumption came from Kurt's feed salesperson at Big Grain. Kurt used the nine-bushel assumption in his year-end settlement sheets from 2003 to 2015. In 2015, Kurt began using a grain cart to weigh the harvested corn before it went into the grain bins to provide a more accurate accounting. He also began weighing the grain that he removed from the shared bins to feed to his hogs.

Based on documents provided by Keith, Brian calculated that between 2010 and 2015, HFI produced over 200,000 bushels of corn that were not sold or otherwise accounted for. Kurt attributed the difference to normal corn loss from things like shrinkage, cleaning, and problems with the grain-handling machinery. Brian and Gregg, on the other hand, attributed the difference to Kurt's theft of HFI corn for his own use.

After becoming a director in the spring of 2015, Gregg attempted to work with Keith, the farm consultant, and HFI's lenders to improve HFI's operations. Gregg preferred to divide up the farm, sell off the equipment, and cash-rent the land. Keith wanted to continue the farming legacy he and his dad had built so he could pass the land to Brian and Kurt to continue farming. By the spring of 2016, Gregg and Brian were contemplating litigation against Keith and Kurt.

Gregg resigned as a director of HFI during an eight-hour shareholder meeting in July 2016, where he unsuccessfully attempted to get his other siblings to join him and Brian in suing HFI, Kurt, and their father. Gregg's director position sat open for a year until the youngest brother, Darren—who was not involved in the family farming disputes—was elected as the second director in the summer of 2017. Like his older brothers, Darren graduated from Iowa State University in 1989 and farmed briefly with HFI, but he quit after finding himself stuck in the middle of a physical altercation between Brian and Kurt that fall. He has worked in the seed industry since. As a director, Darren helped Keith restructure the farming operation, more closely track expenses, and keep a more formal monthly accounting of the corn inventory. HFI reduced its overall debt by $460,000 in the three years following Darren joining the board in 2017.

As relevant to this appeal, Gregg and Brian, individually and on behalf of HFI, brought this action against Keith, Kurt, Heather (Kurt's wife), and HK Farms in August 2017 and filed an amended petition in November 2018 after the case

was assigned to the business specialty court. The amended petition asserted three derivative claims brought by Brian and Gregg as minority shareholders on behalf of HFI against Keith and Kurt for: breach of fiduciary duties owed to HFI (count I); fraud, fraudulent concealment, and fraudulent misrepresentation (count II); and statutory remedies of appointment of an independent custodian or dissolution of the corporation premised on statutory violations (count III).[1] The amended petition alleged that Heather and KH Farms were liable for Kurt's breaches on an aiding and abetting or conspiracy theory. Gregg and Brian also brought a claim as beneficiaries of Celeste's Trust seeking the removal of Keith as trustee, as count IV.[2]

**A. District Court Proceedings.** The district court held an eleven-day bench trial. Fourteen witnesses testified, including the parties, banking and agriculture consultants who worked with Hora Farms over the years, and both sides' experts. In addition, the parties introduced thousands of pages of exhibits.

Gregg and Brian offered expert testimony from Thomas Schnurr, a financial consultant with Business Edge, and Terry Bolt, a former IRS fraud examiner who provides forensic accounting services. Schnurr opined that HFI could have made a profit by cash-renting its farmland instead of farming it over the 2016 through 2017 timeframe at issue and that HFI's books reflected unreasonable deviations. Bolt opined that HFI's sloppy—and sometimes nonexistent—record-keeping failed to account for roughly 212,000 bushels of corn between 2006 and

---

[1]The request for judicial dissolution of HFI was dropped following presentation of the evidence and before final submission of the case to the district court for decision.

[2]The amended petition also included count V, which alleged claims by Precision Partners, Brian's farm corporation owned with his wife, against Keith for interference with business relations. That count was severed for a separate trial following the bench trial for the remaining equitable claims and is not at issue in this appeal. In addition, the amended petition named LoRee Hora, Keith's current wife, as a defendant, but Gregg and Brian dismissed their claims against LoRee just prior to the bench trial.

2017 that was grown but not sold and that Kurt was the beneficiary of that failure. Bolt relied heavily on HFI's tax returns to question Keith's and Kurt's compensation, which reflected only compensation paid in cash and failed to account for any in-kind compensation. Bolt also testified that Keith's and Kurt's failures to adequately inform HFI's accountant about the in-kind transactions resulted in the filing of false and fraudulent tax returns, as well as the failure to file correct W-2 or 1099 forms. Bolt calculated the amount of HFI's corn he believed Kurt actually fed to his hogs using assumptions from Iowa State Extension Services about feeding hogs to market and applying those assumptions to Kurt's records identifying the number of pigs he bought and sold and the number that died before reaching market weight.

Brian and Gregg also called Alan Buckert and Sue Basten as witnesses. Both had banking relationships with HFI, Buckert with Farm Credit Services of America and Basten with Washington State Bank. Each testified about the phone and email communications they separately received from Gregg about his goals for HFI while he was serving as a director in 2015 and 2016, which Gregg asked them to keep confidential from Keith. In those communications, Gregg accused Keith and Kurt of providing incomplete financial information to the lenders and "willfully and with malice [taking] out of the family farm operation." Gregg convinced Basten to inform Keith that Washington State Bank would discontinue extending credit in 2016 for operations if changes were not made because, as Gregg told Basten, he "wanted to push Keith and [HFI] into making some changes in the operation." At the time, Basten thought Gregg's intentions were to help HFI, but by the time of trial, she questioned his true intentions.

Kurt and Keith called industry specialists they had worked with over the years to describe their operations as compared to other farms in the area. Keith also offered expert testimony from Russell Thompson, his tax accountant since

1976. Thompson has worked as a corporate tax and estate planning specialist in the farming industry since the 1970s, and 90–95% of his clients are farmers. For purposes of trial, Thompson reviewed HFI's operations between 2010 and 2018 and provided several opinions about the operations. He testified that Keith leased his personally owned farmland to HFI at significantly below market rates, benefiting HFI by over $960,000 during the relevant period; that HFI leased some of its farmland to Brian and to Kurt (separately), also at below-market rates, which was common in family farms; that Keith's total compensation received from HFI was $96,000 less over a seven-year period than it would cost to hire an outside management company—as Gregg and Brian sought to do; that his comparison of HFI's revenue from grain sales between 2012 and 2018 was "pretty close to at least the average of what Iowa State was showing" in its statewide surveys, reflecting—in his opinion—no mismanagement of HFI; and that HFI had a net worth over $8.9 million as of February 28, 2018, resulting in an annualized 29% growth in the value of HFI since its inception. On cross-examination, Thompson acknowledged that HFI showed losses on its tax returns each year between 2010 and 2017 and that its primary asset was its farmland.

At the end of the trial, Brian and Gregg asked the district court to order Keith and Kurt to pay damages to HFI for their breaches of fiduciary duties, appoint a custodian to manage HFI, remove Keith as trustee of Celeste's Trust, order Keith to reimburse HFI for attorney fees paid on his behalf, and order Keith and Kurt to pay Gregg and Brian's legal fees.

The district court issued a thirty-seven-page, single-spaced order detailing its findings of fact and conclusions of law. The court made numerous specific credibility determinations, including:

- Discrediting Brian's testimony that he could not recall the amount of rent he paid to lease farmland from HFI against testimony that he received favorable rates.

- Finding testimony by Alan Buckert, a financial services officer with Farm Credit Services of America who made loans to HFI, to be "careful, reasonable, objective, and credible in substance and demeanor."

- Finding testimony by John McNutt, who was retained by Keith in March 2015 to provide farm consulting services for HFI, to be "careful, reasonable, objective, and credible in substance and demeanor."

- Finding testimony by Sue Basten, Executive Vice President and senior lender with Washington State Bank who made loans to HFI, to be "deliberate, careful, and credible in substance and demeanor."

- Finding Thomas Schnurr and Kerry Bolt to be less credible than other experts who testified.

The district court also made specific fact findings related to disputed issues as supported by credibility findings, including:

- Relying on Basten's and Buckert's testimony "to indicate ultimate confidence in the information received from" HFI in continuing to advance loans to HFI from their respective institutions and "to support the financial viability" of HFI.

- Crediting Basten's testimony that Gregg asked her to send the letter telling Keith that the bank would stop extending credit over Gregg's testimony denying he asked her to write the letter.

The district court concluded that Brian and Gregg failed to meet the respective burden of proof for each of counts I through III, involving fiduciary duty and fraud-based claims against Keith and Kurt, dismissing those counts. The court also concluded that Brian and Gregg failed to meet their burden of proof

with respect to their claim seeking Keith's removal as trustee of Celeste's Trust, dismissing count IV. Having dismissed each of the tried claims, the district court also denied Brian and Gregg's request for recovery of their legal fees. The district court also dismissed any individual claims against Heather, noting that Gregg and Brian "offered little if any evidence" to establish any grounds to hold her individually liable.

**B. Court of Appeals Proceedings.** Brian and Gregg appealed, which we transferred to the court of appeals. A panel of that court affirmed in part and reversed in part.

On its de novo review of count I, the court of appeals concluded that Keith engaged in self-dealing when he used HFI's credit card to pay his personal expenses, those transactions were not shielded by the business-judgment rule, and Keith failed to establish the payments were "fair to the corporation and comparable to an arms-length transaction." The court of appeals also concluded that "[a]t core, what Keith enabled was civil conversion or criminal theft of HFI corn by his son Kurt," which "was not fair to the corporation and was not the equivalent of an arms-length transaction." The court of appeals affirmed the district court's findings with respect to the remaining allegations against Keith "(other than the personal-expenses and misappropriated-corn claims)," concluding the other allegations were either shielded by the business-judgment rule or not supported by sufficient evidence in the record.

The court of appeals further concluded that Kurt's "trusted position as operations manager of HFI justifies the imposition of fiduciary duties" even though Kurt was not an officer or director of HFI. On its de novo review, the court found "Kurt's repeat misappropriation of HFI corn for his personal use without reimbursement (which could likely be termed civil conversion or criminal theft) breached his duty" and reversed the district court's dismissal of count I against

Kurt with respect to the corn issue. The court of appeals affirmed the district court with respect to the other count I claims against Kurt related to crop input expenses paid by HFI and labor costs for Kurt's farm hands allocated to HFI, finding Kurt's explanations "plausible" and "sloppy" but "lack[ing] the deceptive conduct" it had found "with regard to the misappropriated corn." The court of appeals agreed with the district court that Gregg and Brian failed to prove Heather or HK Farms facilitated the relevant conduct or acted as co-conspirators.

On count I, the court of appeals reversed and remanded with directions for the district court to enter judgment for the plaintiffs and determine damages with respect to: Keith's personal-expenses self-dealing claim, Keith's self-dealing claim for allowing Kurt to misappropriate corn, and Kurt's misappropriation of corn claim. The court of appeals affirmed the district court's statute-of-limitations ruling that damages were limited to those incurred within five years of the August 2017 petition, but it clarified its finding that all of the disputed corn had been misappropriated within that timeframe, and it directed the district court on remand to determine damages related to Keith's personal expenses consistent with its opinion. Additionally, the court of appeals provided that the district court could revisit the plaintiffs' request for trial fees and costs to the extent its opinion affected the analysis of those issues.

The court of appeals affirmed the district court's dismissal of count II related to fraud against both Keith and Kurt based on the high standard required to prove the fraud-based claims.

With respect to count III, seeking appointment of an independent custodian for HFI, and count IV, seeking removal of Keith as trustee of Celeste's Trust, the court of appeals noted that its reversal of three of the underlying breach-of-duty claims impacted the district court's analysis, so it vacated both counts and

remanded "for the district court to decide the question with the correct legal footing on the underlying claims . . . with the benefit of [its] opinion."

All parties sought further review, which we granted.

**II. Standard of Review.**

Brian and Gregg brought counts I through III on behalf of HFI in their capacity as minority shareholders. Shareholder derivative claims are equitable in nature, *see Weltzin v. Nail*, 618 N.W.2d 293, 297 (Iowa 2000) (en banc) (recognizing that a "derivative suit exists only in equity" and holding that fraud claims seeking money damages normally brought at law are nonetheless equitable when brought as a derivative claim), and the district court bifurcated them from count IV, the legal claim brought by Precision Partners against Keith, and presided over them in a bench trial. "We review decisions in shareholders' derivative suits de novo." *Cookies Food Prods., Inc. v. Lakes Warehouse Distrib., Inc.*, 430 N.W.2d 447, 448 (Iowa 1988); *see also* Iowa R. App. P. 6.907 ("In equity cases review is de novo."). This case provides us with a good opportunity to review what a de novo review entails.

De novo review means we review the entire record and "decide anew the issues properly preserved for appellate review." *Struve v. Struve*, 930 N.W.2d 368, 371 (Iowa 2019). But when we say a case is reviewed "de novo, this does not mean that we decide the case in a vacuum[] or approach it as though the trial court had never been involved." *Davis-Eisenhart Mktg. Co. v. Baysden*, 539 N.W.2d 140, 142 (Iowa 1995). To the contrary, while not bound by the district court's findings, we give them weight and "defer[] especially . . . where the credibility of witnesses is a factor in the outcome." *Cookies Food Prods.*, 430 N.W.2d at 448; *see also* Iowa R. App. P. 6.904(3)(*g*) ("In equity cases, especially when considering the credibility of witnesses, the appellate court gives weight to the fact-findings of the district court, but is not bound by them."). This

deference has pragmatic underpinnings. *Hensch v. Mysak*, 902 N.W.2d 822, 824 (Iowa Ct. App. 2017). It is pragmatic because the district court has a front-row seat to the live testimony, viewing the demeanor of both the witness as she testifies and the parties while they listen, whereas our review is limited to reading black words on a white page of a sterile transcript. *See Davis-Eisenhart Mktg. Co.*, 539 N.W.2d at 142 ("Thus, '[e]ven though a case is tried de novo in this court, we have nevertheless repeatedly recognized that, where the testimony is conflicting, great weight is accorded the findings of the trial court, because the witnesses are before him and he is in a far better position to pass upon their credibility than is this court, which is limited to the printed record.'" (alteration in original) (quoting *In re Brooks' Estate*, 294 N.W. 735, 739 (Iowa 1940))); *In re Marriage of Vrban*, 359 N.W.2d 420, 423 (Iowa 1984) ("There is good reason for us to pay very close attention to the trial court's assessment of the credibility of witnesses. A trial court deciding dissolution cases 'is greatly helped in making a wise decision about the parties by listening to them and watching them in person.' In contrast, appellate courts must rely on the printed record in evaluating the evidence. We are denied the impression created by the demeanor of each and every witness as the testimony is presented." (quoting *In re Marriage of Callahan*, 214 N.W.2d 133, 136 (Iowa 1974))).

With this standard in mind, we review the claims raised on appeal.

**III. Analysis.**

**A. Breach of Duty Claim Against Kurt.** We start with the claims against Kurt because some of the claims against Keith involve his supervision of Kurt's actions, specifically related to the corn issue.

Kurt is neither an officer nor a director of HFI, and we reject Gregg and Brian's attempt to impose fiduciary duties on him based on his position as operations manager. Gregg and Brian cite no authority imposing fiduciary duties

on employees merely because they hold management positions, and we are aware of none. Fiduciary duties are generally reserved for individuals in a position of trust, like an agent. *See Cemen Tech, Inc. v. Three D Indus., L.L.C.*, 753 N.W.2d 1, 13 (Iowa 2008) ("[W]e recognized that 'fiduciary duty' is '[a] very broad term [including] . . . informal relations which exist wherever one man trusts in or relies upon another. One founded on trust or confidence reposed by one person in the integrity and fidelity of another.' " (second alteration in original) (quoting *Kurth v. Van Horn*, 380 N.W.2d 695–96 (Iowa 1986))). Although "a principal–agent relationship gives rise to a fiduciary duty of loyalty, and an employer–employee relationship can be closely associated with a principal–agent relationship[,] . . . an employee is not always an agent for the employer." *Condon Auto Sales & Serv., Inc. v. Crick*, 604 N.W.2d 587, 599 (Iowa 1999).

The distinction between an agent and an employee is "based largely on the degree and nature of service and control." *Id.* "An agent usually has greater authority to act for the principal, such as negotiating contracts, while an employee typically renders services at the direction of the employer." *Id.* Thus, whether an employee is acting in a capacity to give rise to fiduciary duties depends on the specific circumstances. *See Cemen Tech, Inc.*, 753 N.W.2d at 13 ("The present case is distinguishable from both *Kurth*[, 380 N.W.2d 693,] and *Weltzin* [*v. Cobank, ACB*, 633 N.W.2d 290 (Iowa 2001),] because here the employees executed confidentiality and nondisclosure agreements" from which a jury could find the employment relationship to be "one based 'on trust or confidence reposed by one person in the integrity and fidelity of another.' " (quoting *Kurth*, 380 N.W.2d at 695)).

In none of the disputed circumstances was Kurt acting as an agent for HFI. Rather, to the extent the parties argue over whether the corn was part of Kurt's compensation, or whether Kurt inadequately accounted for the corn and

other crop inputs, Kurt would have either been acting for his own interests or performing his duties as an employee. That Kurt was the operations manager does not elevate the poor performance of his responsibilities into a claim for breach of fiduciary duties. *See Condon Auto Sales*, 604 N.W.2d at 600–01 (explaining that damages incurred when a sales manager "did not diligently perform his . . . responsibilities as sales manager" were based on the "services performed" for his employer, which were activities that "fall[] outside the scope of any action for breach of loyalty"). Kurt was not acting as an agent for HFI, and he owed it no fiduciary duties. As such, we also reject Gregg and Brian's attempt to shift to Kurt the burden of proving the fairness of his actions, which applies only "[w]here *a fiduciary* is in a position to take advantage over a principal . . . [and] has closer access to the facts." *In re Mt. Pleasant Bank & Tr. Co.*, 455 N.W.2d 680, 685 (Iowa 1990) (emphasis added). The burden remains on Gregg and Brian to prove that Kurt breached a duty owed to HFI.

Limited then to the common law duty of loyalty owed by an employee, Gregg and Brian's claim turns on whether Kurt misappropriated the corn—a fact the court of appeals found in its de novo review—or merely failed to adequately document where it all went. *See Condon Auto Sales*, 604 N.W.2d at 600 ("[T]he duty of loyalty is generally confined to instances of direct competition, *misappropriation of profits, property*, or business opportunities, trade secrets and other confidences, and deliberately performing acts for the benefit of one employer which are adverse to another employer." (emphasis added)). The court of appeals adopted the view of Gregg and Brian's expert, Bolt, who concluded that because Kurt did not report the grain to his accountant to be reported as compensation for tax purposes, he must have stolen it. Yet, after hearing all the testimony and reviewing the exhibits as the witnesses explained them, the district court con-

cluded that the practice of Kurt taking corn as compensation was a long-standing approved business practice within HFI and that any "missing" corn was a matter of poor recordkeeping rather than intentional wrongdoing. In reaching its findings, the district court expressly discredited Bolt's view, noting Bolt had no experience with farm operations. Instead, the district court credited testimony from McNutt, who regularly consults in the farming industry, that Kurt's year-end "settling up" method was not abnormal in a family farm business. Indeed, according to McNutt, the process of "parties get[ting] together and agree[ing] to the value of their contributions and who is owed what . . . has been used by many farms over the years."

These are the types of credibility determinations deserving of our deference on a de novo review. *See Davis-Eisenhart Mktg. Co.*, 539 N.W.2d at 142 (giving weight to district court credibility determinations in a minority shareholder valuation suit where "the trial court found certain valuation witnesses more credible than others"). The district court judge heard the testimony of the expert witnesses and found Keith and Kurt's witnesses—who had vast farming experience—more credible than Brian and Gregg's expert witnesses, who were fraud investigators with no farming experience. On our de novo review—having reviewed the record anew while also giving due deference to the district court's findings—we conclude that the evidence establishes only that Kurt was sloppy in his bookkeeping and continued the farming practices of those before him, not that he intentionally misappropriated corn in violation of the duty of loyalty owed to HFI as his employer. Notably, Kurt's employment contract—written by Brian—expressly recognized that he would be paid in part by corn without identifying a quantity. So Kurt was clearly allowed to take *some* corn. The experts' calculations established that Kurt's presumption of nine bushels per hog understated the amount he actually used, and therefore understated the amount by which he

was actually compensated. But the president of HFI agreed to the nine-bushel formula. Further, that Kurt underestimated the amount of corn he used does not establish that he stole it. It does, however, explain the alleged "missing" corn. If Kurt used more corn than he recorded using his estimates, it is merely a matter of math to conclude that corn was unaccounted for—and only in that sense can the corn be considered "missing."

The real fighting issue is whether Kurt intentionally took more corn than he was entitled to with respect to his agreement with HFI, i.e., whether he misappropriated it. That the corporate tax returns failed to report in-kind compensation paid to Kurt does not mean the additional corn was not part of his compensation. The claims in this case involve the appropriateness of transactions between HFI and Kurt, not whether the transactions were properly reported to the IRS. As to Kurt's intent, we agree with the district court that Gregg and Brian failed to prove that Kurt violated a duty of loyalty by misappropriating corn.

**B. Breach of Fiduciary Duties by Keith.** As a director and officer of HFI, Keith owes common law and statutorily defined fiduciary duties to the corporation. *See* Iowa Code §§ 490.830(1) (2017) (requiring directors discharging their duties to act in good faith and "[i]n a manner the director reasonably believes to be in the best interests of the corporation"), .842(1) (requiring officers to act in good faith and "[w]ith the care that a person in a like position would reasonably exercise under similar circumstances"). Those duties include "a duty of care and a duty of loyalty." *Cookies Food Prods.*, 430 N.W.2d at 451 ("Though the Iowa legislature has codified these duties, their common law antecedents still guide the court when interpreting the scope of the statute." (citation omitted)).

Gregg and Brian's breach of fiduciary duty claims against Keith revolved around Keith's purported lack of oversight over Kurt—which allegedly allowed Kurt to misappropriate corn—and Keith's failure to ensure HFI maintained a

positive cash flow. Gregg and Brian identified specific concerns related to the amount of corn produced by HFI but not sold or otherwise accounted for, the amount of crop input expenses paid for by HFI that seemed unusually high for the amount of acres HFI farmed, and Kurt overcharging HFI when his own farm hands worked for HFI. In addition, Gregg and Brian challenged Keith's use of the HFI corporate bank accounts to pay his personal expenses as a violation of fiduciary duties owed to HFI. Although Keith received only $10,000 as an annual cash salary from HFI, Kerry Bolt identified $193,223 worth of personal expenses paid by HFI for Keith over the nine-year period ending in 2019, averaging just over $21,000 per year.

The district court concluded that Keith's actions were protected by the business-judgment rule, "which affords directors the presumption that their decisions are informed, made in good faith, and honestly believed by them to be in the best interests of the company." *Cookies Food Prods.*, 430 N.W.2d at 453. It also concluded that Keith proved the transactions were made in good faith, honesty, and fairness to HFI under the reversed burden that applies when a fiduciary has a personal interest. *Id.* at 452 (the common law and predecessor to section 490.830 require directors to show "good faith, honesty and fairness" in self-dealing (quoting *Des Moines Bank & Tr. Co. v. George M. Bechtel & Co.*, 51 N.W.2d 174, 216 (Iowa 1952))). The court of appeals disagreed, concluding the challenged transactions were "conflicting interest transactions," *see* Iowa Code § 490.861(2), which required Keith to prove the transactions were "fair to the corporation" as defined in section 490.860(3).

That provision provides in full:

> 3. "*Fair to the corporation*" means, for purposes of section 490.861, subsection 2, paragraph "c", that the transaction as a whole was beneficial to the corporation, taking into appropriate account whether it was all of the following:

*a.* Fair in terms of the director's dealings with the corporation.

*b.* Comparable to what might have been obtainable in an arm's length transaction, given the consideration paid or received by the corporation.

*Id.* § 490.860(3). The court of appeals acknowledged the fact that the total compensation Keith received "could have been appropriate" but set that aside because "an arms-length transaction would not include athletic tickets and personal shopping paid for with crop and infrastructure accounts." The court of appeals also found independent harm to HFI from the "false or incomplete business tax returns" and concluded that allowing Kurt to essentially steal corn did not benefit HFI.

Setting aside the fact that the parties did not invoke the "conflicting interest transaction" provisions in district court, the court of appeals misapplied those provisions here. The overarching determination is whether "the transaction as a whole was beneficial to the corporation." *Id.* With respect to payment of Keith's personal expenses, the court of appeals expressly disregarded the fact that those payments were part of his compensation, which—contrary to the court of appeals' analysis—makes the fact that his total compensation was likely "appropriate" significant to the analysis. That Keith used the farm business accounts to pay the personal expenses—including football tickets—reflects his imprecise recordkeeping; it does not reflect the lack of an "arms-length transaction."

The relevant question is whether compensating Keith as a director by paying his personal expenses was fair to HFI. So understood, the relevant question is the amount of the payment, not the method. *See id.* § 490.860(3)(*b*) (requiring consideration of whether a transaction was "[c]omparable to what might have been obtainable in an arm's length transaction, *given the consideration paid or received by the corporation*" (emphasis added)). Keith received a cash salary of

$10,000 per year and payment of his personal expenses of approximately $21,000 per year. Keith also personally guaranteed HFI's corporate debt, a fact that is relevant to Keith's value to the farm corporation. Like the district court, we reject Gregg and Brian's experts' focus on whether the compensation was accurately reported to the IRS rather than whether it reflected a fair transaction for HFI. Even Bolt agreed that recognizing payment of the expenses as salary "would remedy the problem." Regardless of who carried the burden, payment of $31,000 in cash and benefits as compensation to Keith was fair to HFI.

With respect to Keith's failure to monitor how much corn Kurt took for his own use, the court of appeals disagreed with the district court that the business-judgment rule applied, concluding instead that it was a conflicting interest transaction because Kurt is Keith's son. *See id.* §§ 490.860(2)(*c*) (defining "[d]irector's conflicting interest transaction" to include transactions with the corporation in which "the director knew that a related person was a party or had a material financial interest"), .860(5)(*b*) (defining "related person" to include "[a] child"). As a conflicting interest transaction, Keith bore the burden of proving fairness to the corporation. *Id.* §§ 490.860(3), .861(2)(*c*). The court of appeals concluded that Keith effectively enabled Kurt to commit "civil conversion or criminal theft," which was not fair to HFI.

Under the court of appeals' theory, Keith's oversight of Kurt as an employee of HFI would turn every interaction into a conflicting interest transaction subject to the obligations of Iowa Code section 490.861(2). But a conflicting interest transaction presupposes a specific transaction: "[a] transaction effected or proposed to be effected by the corporation." *Id.* § 490.860(2). Applying that provision broadly to Keith's general oversight of Kurt's actions as an employee would subject every family-owned business that employs family members to a height-

ened standard for its day-to-day operations. The heightened standard might apply to specific transactions like the decision to hire Kurt as the operations manager or to execute a specific contract between Kurt and HFI. But we agree with the district court that the business-judgment rule applied to Keith's general oversight of Kurt as the operations manager for HFI.

Having concluded that Kurt did not misappropriate any corn from HFI, we agree with the district court that Keith did not violate any fiduciary duties owed to HFI in his oversight of Kurt. Keith—with each of his sons over the years—operated his family farm much the way his father before him did. That there are different or better ways to operate the farm and to account for its transactions does not mean Keith has violated fiduciary duties owed to HFI. The family members' disagreements about the best methods for operating the family farm reflect their personal interests more than any detriment to the interests of HFI. Gregg and Brian failed to prove that Keith violated fiduciary duties owed to HFI.

**C. Remaining Claims.** Gregg and Brian's claim for fraud in count II against Keith and Kurt is premised on essentially the same actions underlying their breach of fiduciary claims. We agree with the district court and the court of appeals that that claim, too, fails.

For the same reasons, dismissal of the breach of fiduciary duty claim against Keith precludes the request for the appointment of a custodian over HFI as well as the request to remove Keith as trustee of Celeste's trust.

Having dismissed Gregg and Brian's claims on the merits, we need not address the remaining issues raised in the appeals.

**IV. Conclusion.**

Gregg and Brian failed to prove their fiduciary breach claims against Keith or Kurt. We affirm the district court's judgment, premised on its detailed findings

of facts and conclusions of law.

**DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT JUDGMENT AFFIRMED.**